No. 53,132

STATE OF KANSAS, *ex rel.*, ROBERT T. STEPHAN, Attorney General, *Appellant,* v. ROBERT C. HARDER, Secretary of the Kansas Department of Social and Rehabilitation Services, and the KANSAS MEDICAL SOCIETY, *Appellees.*

(641 P.2d 366)

Opinion filed February 17, 1982.

*Dan Biles,* assistant attorney general, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellant.

*Bruce A. Roby,* of Topeka, argued the cause and was on the brief for appellee Robert C. Harder, Secretary of the Kansas Department of Social and Rehabilitation Services.

*Charles R. Hay,* of Goodell, Stratton, Edmonds, Palmer & Wright, of Topeka,

argued the cause, and *Wayne T. Stratton,* of the same firm, was with him on the brief for appellee Kansas Medical Society.

*Michael W. Merriam,* of Colmery, McClure, Funk, Letourneau & Entz, of Topeka, was on the brief for *amici curiae* Stauffer Communications, Inc., The Kansas City Star Company, Wichita Eagle and Beacon Publishing Co., Inc.

*David P. Woodbury,* of Woodbury & Pickell, of Westwood, was on the brief for *amicus curiae* American Civil Liberties Union of Kansas.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by the State on relation of the attorney general from the decision of the Shawnee District Court in a declaratory judgment action. The principal issue is whether the custodian of public records which contain some information made confidential by law is required upon request to disclose nonconfidential information contained therein, under the provisions of the Kansas public records inspection act, K.S.A. 45-201 *et seq.* (Ensley). The trial court, for various reasons, held that the statute does not require disclosure of the data. The attorney general disagrees with that determination; the defendant, Robert C. Harder, Secretary of Social and Rehabilitation Services, and the intervening defendant, the Kansas Medical Society, applaud the court's ruling.

The requests which engendered this litigation were directed to the Secretary. He was asked to disclose the names of physicians and the amounts of public funds paid to each for abortions performed during a particular time period. Had the requests related to any other medical procedure, the legal issues would have been much the same, but public interest would not have been so acute. That interest, however, has no doubt been responsible for the excellent arguments, and the high quality of the briefs furnished by the parties and the *amici curiae,* for which we express our appreciation. There are a number of issues which we will state and discuss during the course of this opinion; a determination of the principal issue, however, will govern public officials in the disclosure or nondisclosure of a broad range of information in addition to the select data targeted here.

At the heart of this controversy is the Kansas public records inspection act. The first three sections were originally enacted in 1957. The first section has since been amended. The fourth section was added in 1978. The act as applicable here, and as presently existing (in the K.S.A. Ensley edition), reads as follows:

## K.S.A. 45-201:

"(*a*) All official public records of the state, counties, municipalities, townships, school districts, commissions, agencies and legislative bodies, which records by law are required to be kept and maintained, except those of the district court concerning proceedings pursuant to the juvenile code which shall be open unless specifically closed by the judge or by law, adoption records, records of the birth of illegitimate children, and records specifically closed by law or by directive authorized by law, shall at all times be open for a personal inspection by any citizen, and those in charge of such records shall not refuse this privilege to any citizen.

"(*b*) For the purposes of this act and the act of which this act is amendatory, the term 'official public records' shall not be deemed to apply to personally identifiable records, files, and data which are described in K.S.A. 72-6214 and the accessibility and availability of which is limited by the terms of said section."

(Note: 72-6214 deals with personally identifiable school records, and is inapplicable here.)

## K.S.A. 45-202:

"In all cases where the public or any person interested has a right to inspect or take extracts or make copies from any such public records, instruments or documents, any such person shall have the right of access to said records, documents or instruments for the purpose of making photographs of the same while in the possession, custody and control of the lawful custodian thereof, or his authorized deputy. Such work shall be done under the supervision of the lawful custodian of the said records who shall have the right to adopt and enforce reasonable rules governing the said work. Said work shall, where possible, be done in the room where the said records, documents or instruments are by law kept, but if the same in the judgment of the lawful custodian of the said records, documents or instruments be impossible or impracticable, then the said work shall be done in such other room or place as nearly adjacent as may be available."

## K.S.A. 45-203:

"Any official who shall violate the provisions of this act shall be subject to removal from office and in addition shall be deemed guilty of a misdemeanor."

## K.S.A. 45-204:

"(*a*) Upon application to the director of accounts and reports and approval by the director of the accounting procedures to be utilized, each state agency which is not otherwise specifically authorized by law is hereby authorized to charge and collect fees for copies made of public documents by xerographic, thermographic or other photocopying process, in order to recover the actual costs incurred, including any costs incurred in certifying such copies, subject to approval of the fees to be charged by the director of accounts and reports. Each state agency shall remit all moneys received by or for it from fees charged for copies of public documents under this act to the state treasurer at least monthly. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount thereof in

the state treasury and the same shall be credited to the state general fund, unless otherwise specifically provided by law.

"(b) Whenever a state agency is authorized by any other statute to charge fees for copies made of public documents by xerographic, thermographic or other photocopying process, and such fees are not fixed by such statute, the amounts of such fees shall be first approved by the director of accounts and reports in order to recover the actual costs incurred, including any costs incurred in certifying such copies.

"(c) As used in this section:

(1) 'Public document' means any document or other record which is required by law to be kept and maintained by a state agency and which is required to be open to inspection by the public under K.S.A. 45-201 or any other document or record which is made available for copying by the state agency.

(2) 'State agency' means any state office or officer, department, board, commission, institution, bureau, or any agency, division or unit within any office, department, board, commission or other state authority within the executive department of the state. 'State agency' shall not include any agency within the judicial or legislative departments of the state."

Dr. Robert Harder is the Secretary of Social and Rehabilitation Services. In that capacity he is the chief executive of that agency which was created by the legislature to care for the poor and needy in this state. As Secretary, one of his responsibilities is the administration of the Kansas medical assistance program. That program is funded about 50% by the state and about 50% by the federal government, under the Medicaid program. Administration of the Kansas program is subject to both state and federal regulation.

In administering the Kansas medical assistance program, the Secretary, as authorized by K.S.A. 39-708c(s), has entered into agreements with private fiscal agents to perform various functions relating to the claims of "providers," those who provide services to persons entitled to medical assistance under the program. "Providers" include hospitals, clinics, other care facilities, and individual practitioners of the healing arts. Providers submit detailed claim forms to the fiscal agent in order to be paid for their services. These forms include the name and address of the provider, the name and address of the person for whom services are performed, a description of the services performed, and the charges for the services. The claims are examined, reviewed, and when approved are paid by the Department of Administration. During 1977 and through June 30, 1978, the fiscal agent was Blue Cross-Blue Shield of Kansas; since that time, the fiscal agent has been a corporation known as EDS Federal. The records available

through June 30, 1978, are in the form of computer tapes prepared by Blue Cross. EDS Federal maintains a special file containing copies of the paper claim forms and payment records for abortion claims as is now required by federal law; it also stores the claims on microfiche; and it enters and stores the data from claim forms on computer tapes. The testimony at trial indicates that the information sought—names of physicians performing abortions and the amount paid to each—is contained within the computerized data prepared and retained by each of the fiscal agents. A program could be designed to retrieve it; preparation of the program would take a specialist about a month to prepare, and would be expensive. Verification of payment may have to be done manually or by a separate program.

Abortions have been provided at state expense since July 1978 only in limited circumstances, where the life of the mother is endangered by the pregnancy or the pregnancy has resulted from rape or incest, since those are the only circumstances in which Medicaid funds may now be utilized to provide abortions. Kansas has not funded abortions other than in those limited areas since the effective date of the federal act so limiting the use of federal funds. The result of this policy change is that there have been very few abortions publicly funded since July 1, 1978, compared to the estimated 2,000 abortions performed at public expense in the fiscal year ending June 30, 1978.

The information sought is not separately maintained by the Secretary or by the fiscal agents; it is in all instances contained within records which also contain the names and addresses of patients for whom the services were provided, and much other extraneous information. It is undisputed that names and addresses of persons receiving medical assistance, the amounts received, the specific medical aid received, and the medical records of those persons, are confidential. See K.S.A. 39-709b, and 45 C.F.R. § 205.50.

The original requests for information were made to the Secretary by Mrs. Patricia Goodson, a member of the board of directors of Right to Life of Kansas, Inc., an organization which is opposed to abortion. She asked the Secretary repeatedly, both orally and in writing, for the names of the individual physicians who performed abortions at public expense, and the amounts of money paid by the state to each in the year 1977 and subsequent years.

Her requests were continuing ones. When the requests were refused, she turned to the attorney general, asking that he enforce the public records inspections act, commonly referred to as the open records law, which she felt made the release of the information mandatory.

The attorney general concluded that the information sought was contained within public records which the Secretary was required by law to keep and maintain, and that Sections 201 *et seq.,* required that the information be disclosed upon request. He so informed the Secretary. The Secretary responded promptly. He acknowledged that the information could be compiled through a special computer program which would be time consuming and costly (around $2,000), but he suggested that disclosure is not mandated by the statutes; would seriously jeopardize the state's medical assistance program; would constitute an unwarranted invasion of personal privacy; would jeopardize the fragile relationship between SRS and the medical profession and might make such services unavailable in the future; and might result in the identification of recipients. He also suggested that he is not required by the act to compile a special record or listing which, by itself, would not be required or useful to his agency. This action was then filed by the attorney general.

Trial was held on March 13, 1981. Petitioner presented the testimony of the Secretary, an official from the Minnesota department of public welfare, and the manager of EDS Federal in Kansas. The Secretary presented the testimony of three SRS executives, all of whom are familiar with the records and programs of the agency. The intervenor presented the testimony of Mrs. Patricia Goodson, a board member of Right to Life of Kansas, Inc., and Phillip Godwin, M.D., president of the Kansas Medical Society, a member of the Society's Medical Advisory Committee to Welfare, and a participant in the Kansas Medicaid Program.

The trial court set forth his findings of fact, his decision, and his reasons therefor, in a detailed memorandum opinion. He said in part:

"Since all of the data containing the requested information also contains information containing the identity of Medicaid recipients which is required by law to be kept confidential, the defendant Harder is, in effect, being asked to manufacture a record which does not currently exist in the form that it is requested.

"The requested records are not 'public records' which 'by law are required to be kept and maintained' within the meaning of K.S.A. 45-201 and therefore, open to inspection by the public.

. . . .

"The rationale for the Court's decision in this case is that the Kansas Public Records law, K.S.A. 45-201 requires that records which are required by law to be kept and maintained are public records and available for public inspection unless specifically closed by law. The facts are that in this case all of the records containing the requested information contain material which is required by law to be kept confidential. To provide the requested information, records would have to be manufactured or compiled at no small cost to the public in computer time and staff time.

"It is the opinion of this Court that by enacting K.S.A. 45-201, the Legislature did not intend to require public officials or agencies to compile data or disclose all information in the possession of the agency in response to any public request.

. . . .

"Since there is no current Kansas statute which mandates the disclosure of the requested information or requires the defendant, Secretary of SRS, to manufacture records, his refusal to do so was an appropriate exercise of his administrative discretion as Secretary of SRS. Nothing contained in K.S.A. 45-201 requires the creation of a record. The act addresses only those records which are 'required by law to be kept and maintained.' "

Judgment was entered for the Secretary, and the State appeals.

## I.

### ARE THE RECORDS IN ISSUE "OFFICIAL PUBLIC RECORDS . . . WHICH RECORDS BY LAW ARE REQUIRED TO BE KEPT AND MAINTAINED?"

The records in issue are claims of providers of medical services and documentation showing payment thereof. K.S.A. 39-708c($f$) and ($y$) provide general directions to the Secretary to maintain financial records. They read:

"($f$) The secretary shall establish an adequate system of financial records. The secretary shall make annual reports to the governor and shall make such reports as shall be required by federal agencies.

. . . .

"($y$) The secretary shall maintain a system of centralized payment for all welfare expenditures."

K.S.A. 39-708c also provides general authority for the Secretary to participate in the federal Medicaid program. That program is carried out under a myriad of federal regulations which require that various kinds of records be kept in conjunction with Medicaid payments. K.S.A. 39-708c($x$) requires the Secretary to establish payment schedules for each group of health care providers,

subject to both state and federal law and regulations. Obviously the claims must comport with those schedules. While none of the statutes of this state or the federal regulations specifically require the keeping as a separate record a list of physicians to whom payments for abortions are made, it is clear that the Secretary, in maintaining a system of centralized payment for all welfare expenditures, must keep records showing to whom payment was made, for what purpose, and the amount of public funds paid out in each instance. Trial testimony indicated that about 250,000 claims are filed each month. Records of claims and payments are obviously essential to the proper functioning of the office. The Secretary acknowledges that this information *is* kept and maintained. An adequate system of financial records, as required by statute, and sufficient to withstand both federal and state audits, must necessarily include detailed claims and show payments. We hold that the statutes require the Secretary to keep and maintain the records in issue.

## II.

### DOES THE KANSAS PUBLIC RECORDS INSPECTION ACT REQUIRE THE DELETION OF CONFIDENTIAL INFORMATION FROM AN OTHERWISE DISCLOSABLE RECORD?

The attorney general maintains that K.S.A. 45-201 *et seq.* implies a duty on the official custodian of public records to delete confidential information from an otherwise nonconfidential and disclosable record. The Secretary and the intervenor disagree.

The fundamental rule of statutory construction, to which all others are subordinate, is that the purpose and intent of the legislature governs when that intent can be ascertained from the statute. That intent is to be determined by a general consideration of the whole act. See *State v. Dumler,* 221 Kan. 386, 389, 559 P.2d 798 (1977), and *State v. Luginbill,* 223 Kan. 15, 19, 574 P.2d 140 (1977).

The first part of the act, Section 201, provides that public records which are by law required to be kept and maintained, with certain exceptions not here material, are to be at all times open for inspection by any member of the public. Section 202 speaks not only of inspection but of the right to take extracts or make copies. Section 203 puts teeth in the act, not only by making violation a misdemeanor, but by making the violator subject to removal from office. The purpose of the legislature is exceedingly

clear: To subject to public view and scrutiny all of those records which the law requires public officials to keep. Sunshine is the strongest antiseptic—its rays may penetrate areas previously closed. The legislature must have so intended when it enacted this legislation. This is not to say that *all* documents in public offices are open to inspection; only those required by law to be kept and maintained must be made available. The latter, however, must be open for inspection under penalty of the law.

Since the purpose of the act is to provide public disclosure of certain documents, is deletion of confidential or nondiscoverable information reasonably required of custodial agencies? This court has not previously dealt with this specific question. Most of the courts which have dealt with the issue have interpreted public disclosure laws to require, in the interests of disclosure, that the custodial agency delete excluded information from an otherwise disclosable document pursuant to a request for the disclosable information.

The Georgia open records law, Ga. Code Ann. § 40-2701 *et seq.,* is similar in wording and content to the Kansas act, except that it contains an exclusion for "medical records and similar files, the disclosure of which would be an invasion of personal privacy." The petitioner in *Griffin-Spalding &c. Auth. v. WKEU,* 240 Ga. 444, 241 S.E.2d 196 (1978), sought by mandamus access to certain ambulance records. The custodian of the records, a county hospital authority, contended that the records in issue contained medical information, the disclosure of which was forbidden by statute. The Georgia Supreme Court, in a unanimous opinion, said:

"[W]e do agree with the trial court that the intent of the General Assembly was to afford to the public at large access to public records with the exceptions of certain information which the Act exempts from disclosure. We think Code Ann. § 40-2702 can be read in a way to comport with this intent.

"We think Code Ann. § 40-2702 requires a custodian of public records to preserve the confidentiality of information that the public does not have a right to see. The manner of separating this information is left to the discretion of the public agency.

"We recognize that this duty places an additional financial burden upon the hospital authority beyond the mere cost of the administrative task itself. Personnel used to separate the information on the forms will be lost from their normal work duties. Additionally, the hospital may be open to added liability from lawsuits by patients for invasion of privacy if a mistake is made in separating the information. However, we think that Code Ann. § 40-2702 provides for this situation. It

specifically allows the custodian of the records to charge the individual requesting the information with the cost of providing it. The hospital authority in this case has a right to exact payment for these additional duties and liabilities from the radio station before it releases the information. We do note, however, that this charge must be reasonable. It can only be a reimbursement for costs incurred by the hospital. It may not contain a charge for the hospital services." 240 Ga. at 447.

The Federal Freedom of Information Act now lists nine exceptions to its disclosure provisions and then states:

"Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

This provision was added in 1974 and in effect codified the interpretation given to the act by the federal courts. See *EPA v. Mink,* 410 U.S. 73, 93, 35 L.Ed.2d 119, 93 S.Ct. 827 (1973). In *Long v. U.S. Internal Revenue Service,* 596 F.2d 362 (9th Cir. 1979), the court held that under the federal Freedom of Information Act the deletion of identifying information (names, addresses and Social Security numbers) from certain requested computer tapes was reasonable and did not result in the creation of an entirely new record in response to the request.

Several state courts have recognized a duty under various state disclosure laws to delete exempt materials from an otherwise disclosable record. See *Northern Cal. Police Practices Project v. Craig,* 90 Cal. App. 3d 116, 153 Cal. Rptr. 173 (1979); *IBM v. Treasury Department,* 71 Mich. App. 526, 248 N.W.2d 605 (1976); *Newspapers v. Mosczydlowski,* 58 App. Div. 2d 234, 396 N.Y.S.2d 857 (1977); and *Harst Corp. v. Hoppe,* 90 Wash. 2d 123, 580 P.2d 246 (1978). The cases emphasize the importance of allowing public access to official records.

Three principal cases are relied upon to support the contention that the Secretary should not be required to create a "new record." We find all of them distinguishable on the facts. In *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 44 L.Ed.2d 29, 95 S.Ct. 1504 (1975), the court held that the NLRB could not be required, under the Freedom of Information Act (FOIA) to write an opinion explaining and clarifying a phrase used in one of its earlier opinions. In *Forsham v. Harris,* 445 U.S. 169, 63 L.Ed.2d 293, 100 S.Ct. 978 (1980), the court held that the FOIA did not require a federal agency to request from a privately controlled organization documents which had never been in the federal agency's

possession and which had never been agency records. In the same vein, the court in *Kissinger v. Reporters Committee,* 445 U.S. 136, 63 L.Ed.2d 267, 100 S.Ct. 960 (1980), held that the agency was not required, pursuant to an FOIA request, to retrieve for the person making the request, documents which were no longer in its custody. In the case at hand, what is sought is information on records which have not escaped from the Secretary's custody, but which are maintained by contracting parties for agency and official use.

One further issue arises: Are the records which are stored on computer tapes "official public records?" In 1957, when K.S.A. 45-201 was enacted, few computers were in use by either public or private agencies. Since that time, computer usage has mushroomed and it is common knowledge that in many instances the only record maintained is that stored within the computer. We hold that the computer tapes described herein are "official public records."

We have seen that the information requested exists as a part of official public records which are by law required to be kept and maintained. The same records, however, contain information which is by law confidential and may not be released. We think it is far more consistent with the purpose of the Kansas public records inspection act to interpret that act as we now do. We hold that the act implies a duty upon the agency to delete confidential and nondisclosable information from that which may be disclosed, and thus to carry out the act's purpose of making available for public inspection all disclosable parts of the public record. Were this not so, any record which an agency is required by law to keep could be rendered inaccessible to public scrutiny by including confidential material therein.

The disclosure of the information sought, either by deleting confidential information from the existing record or by extracting the requested information therefrom, does not require the "creation" of a new public record.

### III.

#### DOES THE HEAD OF AN ADMINISTRATIVE AGENCY HAVE DISCRETION TO REFUSE TO DISCLOSE CERTAIN PUBLIC RECORDS IN THE PUBLIC INTEREST?

The Medical Society contends that K.S.A. 45-201 represents a codification of the common-law right of the public to inspect

public documents, and that as such the right is subject to the discretion of the custodial agency. This argument is based upon our opinion in the case of *Stephens v. Van Arsdale,* 227 Kan. 676, 686, 608 P.2d 972 (1980), where, in discussing access to certain court records, we said:

"The right of the public to access to public records for public inspection is based in our common law. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 55 L.Ed.2d 570, 98 S.Ct. 1306 (1978). This common-law right to inspect public records has been buttressed in many states by statutory codification. In Kansas we have K.S.A. 1979 Supp. 45-201 . . . .

. . . .

"Simply stated, that statute requires all official public records to be open unless either closed by the judge or by some statute." 227 Kan. 686.

The common law, it is said, puts the burden on the person who seeks to examine public records to show that he has proper "motives" and "reasons" for wishing to examine them. We find the following summary of the common-law right in 76 C.J.S., Records § 35 a:

"The right of inspection of public records exists at common law, but such right is subject to a number of limitations, and, although there is some authority to the contrary, it has been held that the right is limited to persons having a special interest and that there is no right of inspection when inspection is sought merely to satisfy curiosity or to further any improper or useless end or purpose."

Thus, it is argued that the Secretary has discretion to close records to public scrutiny if he finds that disclosure of such records is not in the public interest.

Section 201 excepts from public disclosure records which are specifically closed by law or by directive authorized by law. In *Van Arsdale,* we dealt with K.S.A. 1979 Supp. 21-4619, the expungement statute, which provided in part that:

"(h) Whenever the record of any conviction has been expunged . . . the custodian of the records of . . . conviction . . . shall not disclose the existence of such records . . . [except in certain limited circumstances]."

The records there in issue had been closed both by law and by order of the court from general public scrutiny. We upheld the constitutionality of the statute and directed the respondent, clerk of the Sedgwick District Court, to continue to deny public access to the expunged records. The case does not stand as authority for an agency director to determine whether or not records should be open to public inspection; that determination had already been made by the legislature and the trial court, and the clerk was merely proceeding as directed.

The Kansas act places no burden on the public to show a need to inspect, and requires no particular motives or reasons for inspection. It declares that all legally required records "shall . . . be open for a personal inspection by any citizen . . . ." It gives the custodian no discretion and no choice; it imposes a duty upon the custodian, and subjects him or her to stringent penalties for noncompliance. We hold that the common-law restrictions on public access to open records are inapplicable under the Kansas public records inspection act.

## IV.

### WOULD DISCLOSURE OF THE REQUESTED INFORMATION INFRINGE UPON EITHER THE PHYSICIAN'S OR THE PATIENT'S RIGHT TO PRIVACY?

The privacy claims involve two issues: Whether the requested disclosure will impair a physician's right to personal privacy; and whether such disclosure will infringe a patient's privacy-protected right to make a personal decision to obtain an abortion.

As to the patient's privilege, the United States Supreme Court recognized in *Roe v. Wade,* 410 U.S. 113, 152, 35 L.Ed.2d 147, 93 S.Ct. 705 (1973), that the personal right of privacy encompasses the decision of a woman to terminate a pregnancy. The Medical Society and the *amicus* A.C.L.U. of Kansas contend (1) that disclosure of physicians' names would create the possibility that patients' names might be disclosed; (2) that public knowledge of physicians who perform abortions may deter women from seeking abortions since others might infer that she went to a named physician for that purpose; (3) that disclosure might cause some physicians to discontinue participation in the Medicaid program, thus making it more difficult for some women to obtain an abortion; and (4) that disclosure would invade the physicians' personal right of privacy.

As to the first of these contentions, there is no reason shown by the record to cause this court to suspect that any method employed by the Secretary to delete the confidential information—or to extract the requested nonconfidential portions—will be inadequate or ineffective. Similar information was released, under court order, by the Minnesota department of public welfare. Minnesota's assistant commissioner testified in this case that the release of the names of those who performed abortions and the

amounts paid did not, to his knowledge, lead to the identification of any recipients. On the record before us we have no reason to expect a different result in Kansas.

Contentions (2) and (3) are, of course, highly speculative. The assistant commissioner from Minnesota testified that he could not ascertain any reduction in the number of providers participating in the program following the release of information; over 95% of the physicians in that state were Medicaid participants. Dr. Godwin, president of the ·Kansas Medical Society, expressed the opinion that if names of providers who perform abortions are released, there are two possibilities: Those who provide abortions under the Medicaid program would quit doing so; and numerous physicians would drop out of the Medicaid program. Surveys have indicated that a sizeable percentage of Kansas physicians are dissatisfied with the Medicaid program and some are thinking of dropping out. There is, of course, a third possibility: That release of the information would have no discernible effect upon the number of physicians who participate, as was the case in Minnesota. We cannot say, on the basis of this record, that disclosure would have a "legally significant impact" on the abortion decision or on the physician-patient relationship. See *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 81, 49 L.Ed.2d 788, 96 S.Ct. 2831 (1976).

We now turn to the matter of the physicians' personal privacy. In *Roe v. Wade,* 410 U.S. at 152, the court said that its prior decisions "make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' . . . are included in [the] guarantee of personal privacy." The physicians here are participating in a publicly funded program. It is difficult to conclude that a physician has a fundamental privacy interest in the facts that a service was performed and public funds were expended in payment. The details of the procedure, the communications between physician and patient, even the identity of the patient and the specific date of the operation, are not sought, and will not be disclosed under the request before us. We have carefully examined the cases relied upon by the Medical Society, but find them distinguishable and unpersuasive. We hold that the public's right to know how and for what purposes public funds are spent is a matter of legitimate public concern, far outweighing any personal privacy

right of those providers to whom public funds are disbursed. The fact that public funds were paid to a particular provider for a specified purpose does not give rise to a fundamental personal right of privacy in the recipient. As the United States District Court for the District of Columbia observed in *Public Citizen Health v. Dept. of Health,* 477 F. Supp. 595, 604 (D.D.C. 1979), "Practitioners who contract with the government to provide medical services in exchange for . . . payments perform a quasi-public function."

The same issues raised here were presented to the Minnesota Supreme Court and decided adversely to the Minnesota Medical Association, a party, and the Minnesota Civil Liberties Union, *amicus,* in *Minnesota Medical Ass'n v. State,* 274 N.W.2d 84 (Minn. 1978). The court said in part at pages 91-94:

"Amicus M.C.L.U. contends that the proposed disclosure of the names of physicians who performed abortions will have the legally significant impact not found in *Danforth.* First, there is the danger that patients' names will be accidentally disclosed. Second, any disclosure will have a chilling effect in that women may be prevented from obtaining an abortion by the fear that their names might be accidentally disclosed. Third, a woman may be deterred from seeking an abortion from the doctor named because people might correctly infer the reason she saw that doctor. Fourth, disclosure may cause some doctors to discontinue performing abortions, thus making it more difficult for women to find a willing doctor and infringing their freedom of choice in the selection of a physician. M.C.L.U. also notes that the confidentiality of the physician-patient relationship is protected under state law.

". . . Whenever the state acquires confidential information, the possibility of accidental disclosure exists. That possibility is not sufficient to preclude the state from acquiring the information, *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and should also not be sufficient to deprive the public of access to other, nonconfidential information. . . . [T]here is no evidence to support the speculation that the mere possibility of disclosure of patient identities, however slight, will be a significant factor in a medical assistance patient's decision not to seek an abortion.

"The guilt-by-association argument is also without evidentiary support and appears even less reasonable. The validity of that argument must rest on the assumption that once a doctor is known to have performed abortions, it may be inferred that all, or at least the majority, of his female patients employ him to perform abortions. Only if the doctor provides almost no services except abortions, does such an assumption have merit. In such a case, it is likely that the nature of the doctor's practice would be known even without disclosure of the department's information. Thus, it is improbable that disclosure will have any significant effect on the inferences that can be drawn from the fact that a woman visits a particular physician.

. . . .

"Moreover, it seems unlikely that mere disclosure of the fact that a doctor has

performed abortions will cause him to stop providing that service. Once that fact is known, the doctor has little reason to stop. In fact, disclosure could aid women seeking abortions to find a doctor willing to provide the service.

"Of course, disclosure may also permit those who oppose abortions to focus pressure on the named doctors to convince them that it would be in their best interests to cease providing the service. The propriety of such action, however, is not before this court, which is concerned on this appeal only with the effect of the disclosure itself.

"The United States Supreme Court has indicated that any state action that interferes with a woman's right to make an independent abortion decision or with her physician's exercise of medical judgment constitutes an invasion of her right to privacy, at least during the first trimester of pregnancy. See, *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 81, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788, 812, where the court stated:

" ' ° ° ° We naturally assume, furthermore, that these recordkeeping and record-maintaining provisions will be interpreted and enforced by Missouri's Division of Health in the light of our decision with respect to the Act's other provisions, and that, of course, *they will not be utilized in such a way as to accomplish, through the sheer burden of recordkeeping detail, what we have held to be an otherwise unconstitutional restriction.*' (Italics supplied.)

"The disclosure sought to be prevented in this case would not constitute such an 'otherwise unconstitutional restriction.' Disclosure places no burden on the doctor, does not destroy the confidentiality of his relationship with patients, and does not restrict his freedom to exercise his medical judgment. Disclosure itself does not have any effect on the moral or ethical considerations that affect his decision whether or not to perform abortions. If antiabortion factions of the public convince him to stop performing abortions, his decision will be the result of private, not state, actions. Therefore, even if the ultimate consequence of disclosure is a reduction in the number of physicians willing to perform abortions, that reduction will not constitute an unconstitutional infringement of women's rights of privacy.

. . . . .

"[T]he question presented by the assertion of the physicians' right of privacy is whether the personal right claimed—that is, the right of medical assistance providers to keep the details of their dealings with the department of public welfare from becoming public knowledge—is 'fundamental' or 'implicit in the concept of ordered liberty.'

". . . The department does not propose to disclose 'all their professional and business dealings.' Only services that are paid for with public funds are involved. The providers contracted with the department to provide medical care to medical assistance patients and were paid by the department for services rendered pursuant to the agreement. The intervenors seek disclosure of information concerning only those services and payments.

"Viewed in this manner, the contention that disclosure would infringe the physicians' personal rights of privacy loses much of its force. The public has a right to know about the workings of government.

. . . . .

"[T]he information to be disclosed cannot be characterized as purely 'personal'

since it concerns the expenditure of public funds. In *Nixon v. Administrator of General Services,* 433 U.S. 425, 459, 97 S.Ct. 2777, 2798, 53 L.Ed.2d 867, 901 (1977), the court distinguished between the former president's personal matters 'for example, "extremely private communications between him and, among others, his wife, his daughters, his physician, lawyer and clergyman, and his close friends as well as personal diary dictabelts and his wife's personal files." [*Nixon v. Administrator of General Services,*] 408 F. Supp., at 359.' and matters relating to acts done in his public capacity. The same distinction can be made between a doctor's private records and the records of the department of public welfare's payments to him. The latter records are not 'extremely private communications.' It must, therefore, be concluded that disclosure of the information sought here will not infringe physicians' constitutional rights of privacy."

We find that opinion persuasive and well reasoned, and we agree with and adopt the conclusions reached by the Minnesota court.

## V.

### WHO SHALL BEAR THE EXPENSE OF DELETING THE EXEMPT MATERIAL FROM AN OTHERWISE DISCLOSABLE RECORD?

The information requested may be provided by deletion or extraction. The latter appears to be the customary procedure where the bulk of the data is stored on computer tapes. It will require, however, the creation of a special computer program and, for certain of the time periods, perhaps a certain amount of visual examination of claims and vouchers. The trial court found that the estimated cost of development of the computer program was $2,000 and that would be followed by a computer run costing perhaps $3,600. It is not clear from the record whether this estimate covers recovery of both the Blue Cross and the EDS Federal data, or just the latter. It does not include the individual examination of claim forms and vouchers which may be required. It is clear, however, that we are concerned with a substantial expenditure.

K.S.A. 45-204 does not specifically mention the retrieval of information from computerized records. It does, however, make clear the legislative intent that the state recover the actual costs incurred by state agencies in the furnishing of information to the public pursuant to the Kansas public records inspection act, and that the person seeking information should bear the actual expense. Charging the requesting party with the attendant expense does not appear inconsistent with the purposes of the act, and

appears to be the express intent of the legislature. See K.S.A. 45-204(*a*) and (*b*). We conclude that the requesting party may be required to make a deposit with the agency, in an amount approved by the director of accounts and reports, before the project is undertaken; and we further hold that the agency shall have a reasonable time to furnish the requested information so that its everyday functions are not impeded or disrupted.

The judgment is reversed.