IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
(HEARD AT SHELBYVILLE)

**FILED**

November 16, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

FOR PUBLICATION

THE TENNESSEAN, a division of )
Gannett Satellite Information )
Network, Inc., and FRANK )
SUTHERLAND, )
           )  Filed:  November 16, 1998
    Appellants, )
           )  DAVIDSON CHANCERY
Vs. )
           )  HON. ELLEN HOBBS LYLE,
ELECTRIC POWER BOARD OF )      CHANCELLOR
NASHVILLE, )
           )
    Appellee. )  NO.  01-S-01-9709-CH-00181

**For Appellants:**
Alfred H. Knight
WILLIS & KNIGHT
Nashville, Tennessee

**For Appellee:**
Larry Stewart
Charles W. Cook
Nancy A. Vincent
STOKES & BARTHOLOMEW, P.A.
Nashville, Tennessee

Eugene Ward
N.E.S. General Counsel
Nashville, Tennessee

**For Amicus Curiae, Tennessee**
**Press Association:**
Richard L. Hollow
Nathan D. Rowell
WATSON, HOLLOW & REEVES
Knoxville, Tennessee

**For Amicus Curiae, Tennessee**
**Municipal Electric Power**
**Association:**
Frank S. King, Jr.
KING & BALLOW
Nashville, Tennessee

# O P I N I O N

COURT OF APPEALS REVERSED;
REMANDED TO TRIAL COURT         ANDERSON, C.J.

We granted this appeal to address two questions of first impression under the Tennessee Public Records Act: first, whether a government agency should be required to disclose its customer names, addresses, and telephone numbers as a public record, even though it did not maintain the information in its computer in the exact format in which it had been requested; and second, whether the same government agency may require payment of costs incurred in disclosing the information and the cost of notifying its customers that the information had been requested.[1]

The trial court found that the government agency in this case, the Electric Power Board of Nashville and the Nashville Electric Service, was required to disclose the names, addresses, and telephone numbers of its customers as requested by *The Tennessean*, a Nashville newspaper, but that the agency could require payment of costs incurred in disclosing the information and the cost of notifying its customers that the information had been requested. The Court of Appeals reversed, concluding that the information requested by *The Tennessean* was not a "record" kept by the agency. The court, however, upheld the disclosure and notification costs charged by the agency.

We agree with the trial court's finding that the information sought by *The Tennessean* is a public record under the Public Records Act and conclude it is consistent with the legislative mandate of providing "the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d) (1992). We further conclude that the Public Records Act authorized the agency to require payment for the costs of disclosing the records but not for the costs of notifying customers that a request had been made for the information. Tenn. Code Ann. § 10-7-506(a) (1992 & Supp. 1998). Accordingly, we reverse the Court of Appeals' judgment and remand the case to the trial court for further proceedings.

## BACKGROUND

---

[1] Oral argument was heard in this case on April 2, 1998, in Shelbyville, Bedford County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

*The Tennessean* and its editor, Frank Sutherland, sought to obtain from the Electric Power Board of Nashville and the Nashville Electric Service (hereinafter "NES") a list of names, addresses, and telephone numbers of its customers. The request was refused on the ground that NES did not possess a record containing the specific information sought.

Victor Hatridge, Vice President and Chief Information Officer for NES, stated in an affidavit that NES did not have a "list or data compilation" that contained only the information sought by *The Tennessean*, nor had it ever needed such a list to conduct business. He indicated that the closest compilation NES had found was a microfiche report that was generated monthly and contained the names and addresses of service meter locations. He also stated that NES had solicited telephone numbers from its customers to install an Interactive Voice Response system; approximately ninety percent (90%) of the numbers had been accumulated, but no distinction had been made between published and unpublished numbers. According to the affidavit of Wendall Wheeler, an employee with the contractor of NES's information systems, the cost of writing a computer program to add the telephone numbers to the list of names and addresses was $4,500.

Hatridge stated that NES also had a Master Tape that contained not only the information requested by *The Tennessean* but also various additional information such as service numbers, customer numbers, locations, critical health indicators, and distribution numbers. Hatridge said that the cost of computer time to produce a copy of the Master Tape was $100, and the cost to modify the Master Tape to fit the format requested by *The Tennessean* was approximately $1,800.

The record reflects that NES gave *The Tennessean* an estimate of the costs incurred in disclosing the information as well as costs totaling $86,400 for notifying its 292,000 customers that a request for information had been made. The customer notification policy, which was adopted by NES on December 21, 1994, arose out of

concern for the privacy and physical safety of its customers and requires individual notice to be sent by first class mail to a customer whose account has been accessed by a third party.[2]

## TRIAL COURT'S FINDINGS AND CONCLUSIONS

After considering the evidence and arguments of the parties, the trial court made findings of fact as follows:

# That NES did not possess a single document containing the names, addresses, and telephone numbers of its customers as requested by *The Tennessean*;

# That NES did possess a microfiche report containing customer names and addresses of service locations;

# That the cost of writing a computer program to add telephone numbers to the list of customers names and addresses was approximately $4,500;

# That NES did possess a separate Master Tape with all the information sought as well as information that was not sought;

# That the cost of copying the Master Tape was $100;

# That the cost of writing a program to extract the requested information from the Master Tape was $1,800;[3] and

# That the cost of notifying NES's customers by first class mail that information had been requested was $86,400.

The trial court decided that NES was required to disclose the requested information, stating:

> In that "Public Record" is defined to encompass "other material, regardless of physical form or characteristics made or received . . . in connection with the transaction of official business," combined with the statutory requirement that the Court must construe "access" to give the fullest possible public access to public records, and that the burden of proving justification for denial of access is on the official denying access, the Court finds that NES has failed to carry its burden and that the information requested in this case is a public record.

---

[2] To support its argument that notification protected the physical safety of its customers, NES relied upon an October 1994 newspaper article in *The Tennessean* regarding a lawsuit filed against NES for providing the Nashville address of a criminal informant who was murdered prior to a trial in which he was to testify.

[3] In what appears to be a typographical error, the trial court's order states $18,000. The affidavits and other evidence in the record clearly indicate an amount of $1,800.

The trial court also upheld the costs charged by NES for producing the requested information, as well as the cost of notifying its customers, relying on a statutory provision allowing the lawful custodian of records "to adopt and enforce reasonable rules governing the making of such extracts, copies, photographs or photostats" of such records. Tenn. Code Ann. § 10-7-506(a). The court then concluded that NES's production and notification costs totaling $91,619 were appropriate.[4]

## COURT OF APPEALS' RULING

Both sides appealed the trial court's ruling. NES argued that the trial court erred in requiring it to produce as a public record information that was not contained in its computer in the exact format requested by *The Tennessean*. The newspaper conceded that it should pay the cost of producing the records but objected to the payment of notification costs.

In reversing the trial court's judgment, the Court of Appeals concluded that a "natural and ordinary" meaning of "record" meant "information gathered or organized on a particular subject and in a particular format." Since it was undisputed that NES did not possess a list containing only a list of its customer names, addresses, and telephone numbers in the particular format requested by *The Tennessean*, the appellate court held that NES was not required to create a "new" record to satisfy the request. The appellate court also upheld the right of NES to demand payment under its customer notification policy.

We granted this appeal to review these questions of first impression under the Tennessee Public Records Act.

## ANALYSIS

---

[4] The costs found by the trial court included: $2,677 for producing a list of customer names and addresses; $714 for programming to add telephone numbers to the list; $1,828 in computer time; $82,200 postage for notification of 292,000 customers by first class mail; and $4,200 in labor costs for preparing and mailing the notification.

## Public Records Act

We first review the provisions of the Tennessee Public Records Act and this Court's previous interpretations of the Act. Like every state and the federal government, Tennessee has legislation allowing citizens to inspect certain public records.[5] The Tennessee Public Records Act provides, in part:

> (a) All state, county and municipal records and all records maintained by the Tennessee performing arts center management corporation . . . shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law.

Tenn. Code Ann. § 10-7-503 (1992 & Supp. 1998).[6]

The Act defines "public record" as "all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental agency." Tenn. Code Ann. § 10-7-301(6) (1992). Those records which are to be kept confidential and not disclosed are specifically set out in the Act. Tenn. Code Ann. § 10-7-504 (1992 & Supp. 1998).

If denied access to public records under this Act, either in whole or in part, a citizen is "entitled to petition for access to any such record and to obtain judicial review of the actions taken to deny the access." Tenn. Code Ann. § 10-7-505(a). The burden of proof for justifying nondisclosure or demonstrating that a record is statutorily exempt from disclosure rests with the agency that has denied access. Tenn. Code Ann. § 10-7-505(c). The legislature has expressly stated that in reviewing a petition for access, the

---

[5] Such legislation may be referred to by one of several similar terms: Public Records Act; Open Records Act; Data Practice Act; and Freedom of Information Laws. See, e.g., 5 U.S.C. § 552 (1989 & Supp. 1997) (federal government Freedom of Information Act).

[6] It is undisputed that NES qualifies as a "county or municipality."

courts must construe the Act "so as to give the fullest possible public access to public records."  Tenn. Code Ann. § 10-7-505(d).

Our recent cases reflect the broad construction of "record" under the Act and a consistent adherence to the policy of full public access.  See, e.g., Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d 681 (Tenn. 1994) (depositions taken in bankruptcy proceeding in which the city and county were parties were public records);  Griffin v. City of Knoxville, 821 S.W.2d 921 (Tenn. 1991) (the Public Records Act is "an all-encompassing legislative attempt to cover all printed material created or received by government in its official capacity.");  Memphis Publ'g Co. v. Holt, 710 S.W.2d 513 (Tenn. 1986) (closed investigative report of the Memphis Police Department was a public record).  In Holt, this Court specifically rejected an invitation to judicially create a public policy exception to the Act, re-affirming that:

> It is the prerogative of the legislature to declare the policy of the State touching the general welfare.  And where the legislature speaks upon a particular subject, its utterance is the public policy . . . upon that subject.

Id. at 517 (citation omitted).

In the present case, we are confronted with an issue of first impression in Tennessee, that is, the application of the Public Records Act to information that is stored and maintained via computerized technology.  Our interpretation will have broad application because of the increasing use of such technology to store public information.  As one commentator has said:

> Over the past decade or more, government computer use has increased dramatically.  In just a few years, some agencies have gone from filing paper records on seemingly endless rows of shelves in huge storage rooms to keeping most of those records in computers. . . .  As years have passed and governments have grown, so has the amount of records governments keep.  In many cases it has become impractical, if not impossible, to continue to handle paper records.  It takes too much space and too many employees to keep track of paper records.  At the same time, the cost of basic computer technology has plummeted, making computers affordable to even the smallest governmental units.

Matthew D. Bunker, Access to Government-Held Information in the Computer Age: Applying Legal Doctrine to Emerging Technology, 20 Fla. St. U. L. Rev. 543, 559 (1993).

As Bunker suggests, a more difficult issue with regard to public access is generated from the numerous formats in which electronic information may be stored and retrieved from computer systems. For example, he asks:

> Are computerized public records subject to the same degree of access as records in their traditional forms? Who decides the form in which computerized records are made available to the public? Is a computer tape itself a public record and subject to copying, or can agencies meet their statutory obligations by providing paper copies of information? Are computer programs themselves, as distinct from the information stored in computers, public records?

Id. at 568; see also Henry D. Perritt, Jr., Electronic Acquisition and Release of Federal Agency Information: Analysis of Recommendations Adopted by the Administrative Conference of the United States, 41 Admin. L. Rev. 253, 295 (1989). The following example is illustrative:

> [A] journalist might want to search a courthouse computer database to determine whether a certain judge has been tough or lenient in sentencing drunk drivers. But rather than reviewing every drunk driving case, the journalist may want to sort the cases by the judge's name. So the journalist might ask the records custodian to modify the database management system or applications program to allow the search. Some users believe that to take full advantage of the new electronic information technology, agencies should provide this type of reprogramming. Some records custodians, however, have argued that such searches create 'new' records, something not required under most freedom of information laws. In addition, custodians have said, the cost and the time it takes to reprogram are prohibitive.

Bunker, supra, at 561 (emphasis added).

While it ruled in favor of NES, the Court of Appeals did not directly address these issues. It instead narrowly interpreted the definition of a "record" in Tenn. Code Ann. § 10-7-503(a) as "information gathered or organized on a particular subject and in a particular format and not the information or data itself." Since the parties agreed that

NES did not possess the requested material in the particular format requested by *The Tennessean*, i.e., customer names, addresses and telephone numbers, the appellate court reasoned that the Public Records Act did not require NES to alter its existing records or to create a new record at the request of a citizen. The appellate court also concluded that the information requested by *The Tennessean* was not "made or received pursuant to law or ordinance or in connection with the transaction of official business." See Tenn. Code Ann. § 10-7-301(6).

We believe the Court of Appeals' emphasis on the physical format of a record is inconsistent with the language in the Public Records Act and its policy of full disclosure. It is clear that the legislature intended that the Public Records Act apply to computer records by defining a "record" to include "electronic data processing files and output." Id. Moreover, a record as defined in the Act also includes "other material, regardless of physical form or characteristics." Id. A "record," therefore, is broadly defined by the legislature and does not consist of a particular physical format or form.[7]

In addition, although few courts have addressed the precise issue presented in this case, several have previously analyzed the format issue and held that the particular format of a record is not dispositive of whether it must be disclosed to the public.

For example, a Florida appellate court considered the format issue in Seigle v. Barry, 422 So.2d 63 (Fla. Dist. Ct. App. 1982). Access was sought to public records maintained on computer, and payment was offered for a program that would produce the records in the desired format. The court began its analysis by observing that "there can be no doubt that information stored on a computer is as much a public record as a written page in a book or a tabulation in a file stored in a filing cabinet." Id. at 65. The court also explained that "all of the information in the computer, not merely that which a

---

[7] In fact, we note that the definition of "material" includes "ideas, notes, observations, sketches, etc. that may be worked up or elaborated; data." Webster's New World Dictionary, 874 (2d ed. 1980) (emphasis added); see also Bunker, supra, at 597 ("information in a computer already exists as a government record").

particular program accesses, should be available for examination and copying in keeping with the public policy underlying the right to know statutes." Id.

The court then turned to "the more insidious question of whether the public may require information contained in public records to be made available for inspection and copying in a particular format." Id. (emphasis in original). After discussing the competing interests between the public's right of access to information in a meaningful format and the burden on an agency to comply with requests for information, the court held that an agency not only must allow access to computerized records through the use of its existing programs, but also must create a new program to access public records in circumstances where "available programs do not access all of the public records stored in the computer's data bank." Id. at 66-67 (emphasis in original). The court remanded the case for a hearing on these issues.

The Illinois Supreme Court considered the same issue and reached a similar conclusion in Hamer v. Lentz, 547 N.E.2d 191 (Ill. 1989). There, the plaintiffs requested information from the General Assembly Retirement System, which included the length of service and the total pension of all former General Assembly members. The defendant refused to disclose the information, arguing that it was not required to go through its records and create a new document. The Illinois Supreme Court rejected this argument by saying:

> [T]he defendants' position seems to be that if information is located in two different places, producing that information involves the creation of a new record. Such a position is supported neither by legal authority nor by logic.
>
>     We conclude that the appellate court correctly ruled that defendant[s] must disclose all of the requested information.

Id. at 194. The court also said that if necessary the defendant was required to create a computer program that would generate the requested information onto hard copy. Id. at 195. See also Family Life League v. Department of Pub. Aid, 493 N.E.2d 1054 (Ill.

1986) (defendant was ordered to create a special computer program to delete the exempted information).

The Kansas Supreme Court considered the issue of confidential information in State ex rel. Stephan v. Harder, 641 P.2d 366 (Kan. 1982). The plaintiffs sought non-exempt medical information from the Secretary of Social and Rehabilitative Services. The defendant asserted, and the testimony showed, that the information sought was contained in the agency's computer system, but was combined with other information that contained confidential information. The evidence also showed that a computer program could be designed to extract the non-exempt material from the confidential information. The trial court ruled that the agency had no duty to segregate the disclosable material, but the Kansas Supreme Court reversed:

> We hold that the [public records] act implies a duty upon the agency to delete confidential and nondisclosable information from that which may be disclosed, and thus to carry out the act's purpose of making available for public inspection all disclosable parts of the public record. Were this not so, any record which an agency is required by law to keep could be rendered inaccessible to public scrutiny by including confidential material therein.
>
> The disclosure of the information sought, either by deleting confidential information from the existing record or by extracting the requested information therefrom, does not require the 'creation' of a new public record.

Id. at 374.

Finally, in a Connecticut case, Maher v. Freedom of Info. Comm'n, 472 A.2d 321 (Conn. 1984), a variety of information was requested regarding medication prescribed to state Medicaid recipients. The information was maintained on computer tape by the Department of Income Maintenance (DIM). The Connecticut Supreme Court rejected DIM's defense that it did not maintain the records in the form requested and concluded that "[w]here, as here, the information sought is presently stored in the agency's data base, and the cost of the new program is to be borne by the person seeking the

information, an order compelling production of computer tapes is within the powers statutorily conferred. . . ." Id. at 325.

One commentator has observed that "[i]t is more desirable to charge requesters the actual costs of retrieval, or provide them with retrieval hardware, software and documentation, than to decline . . . requests for electronic information because they require 'programming' or generating new records." Perritt, supra, at 295 (footnote omitted).[8]

The defendant NES has cited two cases for an opposing view which, in our judgment, are distinguishable. In Seaton v. Johnson, 898 S.W.2d 232 (Tenn. App. 1995), an attorney representing victims killed in an automobile accident that occurred at a railroad crossing sought what the Court of Appeals called a "shopping list of information" from the Department of Transportation, including the average daily vehicle and locomotive traffic at the accident site, the method for computing the average daily traffic, the accident history, and the installation costs and history of traffic control devices. The Court of Appeals held that disclosure was not required based on a federal statute that preempted the Tennessee Public Records Act. Id. at 237.

The other case relied on by the defendant is George v. Record Custodian, 485 N.W.2d 460 (Wis. Ct. App. 1992). There, an inmate asked for the number of claims received by the Department of Justice from 1988-1990, the number of cases settled without litigation, and the number of cases disallowed. The Wisconsin appellate court held that the records custodian was not required under the public records act to "collect or compile statistics or create a record for the benefit of a requester." Id. at 462.

---

[8] These cases are consistent with principles that have been applied to non-computerized records. Long v. IRS, 596 F.2d 362 (9th Cir. 1979) (deletion of information from a public record does not create a new record); Disabled Officer's Ass'n v. Rumsfeld, 428 F. Supp. 454, 457 (D.D.C. 1977) (that plaintiff "phrased its request in a somewhat different form does not affect the substance of the request"); Northern Cal. Police Prac., Etc. v. Craig, 153 Cal. Rptr. 173, 178 (Cal. Ct. App. 1979) (focus is on "information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material"); Bowie v. Evanston Community Consol. Sch. Dist., 538 N.E.2d 557 (Ill. 1989) (deleting information from a record does not create a new record).

In contrast to <u>Seaton</u> and <u>George</u>, *The Tennessean's* request did not require NES to compile or collect statistics, nor did it require an explanation, interpretation, or analysis of information. NES did not claim that the requested information was exempt from disclosure, nor did it contend that it lacked the information. The question presented in this case is one of format and access.

We recognize the competing interests at stake: the public's right to access and a government agency's burden of complying with the Public Records Act. Yet once information is entered into a computer, a distinction between information and record becomes to a large degree impractical. In our view, it makes little sense to implement computer systems that are faster and have massive capacity for storage, yet limit access to and dissemination of the material by emphasizing the physical format of a record. As one commentator observed, "[a]gencies may not design systems with access in mind, only to claim later that information is unavailable because 'our computers can't do that.'" Bunker, <u>supra</u>, at 594. Indeed, such a defense invoked at random by an agency would frustrate the purpose of the Public Records Act at nearly every turn.

Accordingly, we reverse the Court of Appeals and reinstate the trial court's judgment that NES was required to disclose the information under the facts of this case.

**Costs**

We now address the issue of the costs charged by NES for producing the requested material and for notifying its customers by first class mail that a request for the information had been made. In upholding such costs, both the trial court and the Court of Appeals cited the following provision under the Public Records Act:

> In all cases where any person has the right to inspect any such public records, such person shall have the right to take extracts or make copies thereof, and to make photographs or photostats of the same while such records are in the possession, custody and control of the lawful custodian thereof or such authorized custodian's deputy; <u>provided, the lawful custodian of such records shall have the right to adopt and enforce</u>

-13-

> reasonable rules governing the making of such extracts, copies,
> photographs or photostats.

Tenn. Code Ann. § 10-7-506(a) (emphasis added).


      Although *The Tennessean* concedes that NES could properly charge for the costs incurred in making or extracting the requested material from its existing records, it argues that the charges assessed under NES's customer notification policy were not authorized by statute and amounted to an effective denial of records. *The Tennessean* maintains that § -506(a) conveys only "a ministerial authority to . . . charge for or allow time periods for, the copying of documents" and not authority to impose "substantive" conditions for disclosing information required under the Act. NES argues, and the lower courts found, that the notification policy was a reasonable means to protect the privacy and safety of its customers.


      We think the language and meaning of Tenn. Code Ann. § 10-7-506(a) is plain: that an agency may enforce reasonable rules "governing the making of such extracts, copies, photographs or photostats." Those actual costs incurred by NES for disclosing the material requested by *The Tennessean* are recoverable under this statute. In contrast, there is no authority under the Act allowing an agency to establish rules that would substantially inhibit disclosure of records. Moreover, limiting an agency to rules that govern only the actual "making" of the extracts, copies, photographs or photostats is consistent with the legislative policy in favor of the fullest possible public access.


      Our review is governed solely by the language in the Public Records Act and the clear mandate in favor of disclosure. We do not question the sincerity or intention of NES in making a policy that is, on the surface, in the interests of its customers' privacy or safety. Yet these and any other matters of public policy that may affect the rights of access under the Public Records Act may not be adopted ad hoc by a government agency without action by the legislature. As we said in <u>Holt</u>:

It is the prerogative of the legislature to declare the policy of the State touching the general welfare. And where the legislature speaks upon a particular subject, its utterance is the public policy . . . upon that subject.

710 S.W.2d at 517 (citation omitted).

Accordingly, we have determined that the Public Records Act authorizes NES to require payment for actual costs incurred in disclosing the requested records but contains no statutory authorization for requiring payment of costs to implement NES's customer notification policy.

## CONCLUSION

We conclude that the trial court correctly determined that the information sought by *The Tennessean* constituted a public record that had to be disclosed by NES under the Tennessee Public Records Act. We further conclude that while NES could require payment of costs incurred in disclosing the requested material, it was not authorized by the Act to require payment of costs for its own customer notification policy. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to the trial court for further proceedings. Costs on appeal shall be paid by NES, for which execution shall issue if necessary.

_____
RILEY ANDERSON, CHIEF JUSTICE

**CONCUR:**

Drowota, Birch, and Holder, JJ.
Russell, Sp. J.