No. 63,442

STATE OF KANSAS, *Appellant*, v. RANDY L. HUGHES, *Appellee*.
(792 P.2d 1023)

Opinion filed May 25, 1990.

*Debra Byrd Wagner*, assistant district attorney, argued the cause, and *Mona Furst*, assistant district attorney, *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were on the brief for the appellant.

*Stephen B. Plummer*, of Rumsey, Richey & Plummer, of Wichita, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

MILLER, C.J.: The defendant, Randy L. Hughes, was charged in Sedgwick district court with promoting obscenity by selling two obscene devices contrary to K.S.A. 21-4301. The trial court found the provisions of K.S.A. 21-4301(1), (2), and (3)(c) to be unconstitutionally overbroad and dismissed the case. The State appeals pursuant to K.S.A. 1989 Supp. 22-3601(b)(2) and K.S.A. 22-3602(b)(1).

Hughes, the manager of an adult bookstore in Wichita, was arrested and charged with selling obscene devices: "The Sexplorer Pleasure System," a vibrator kit with a dildo attachment, and "Miss World," an inflatable doll with an artificial vagina, to undercover police officers. Defendant moved to dismiss. The trial court held an evidentiary hearing. Dr. Douglas Mould, a state-

certified psychologist and sex therapist who was called by the defendant, was the only witness.

Dr. Mould practices psychology, including sex therapy, in Wichita. His main area of research and writing is devoted to the problem of women who do not reach orgasm during sexual intercourse. Dr. Mould testified that anorgasmic women may be particularly susceptible to pelvic inflammatory diseases, psychological problems, and difficulty in marital relationships.

Dr. Mould testified it is common in the treatment of anorgasmic women to recommend the use of a dildo-type vibrator. Such a vibrator is penis-shaped and used primarily for vaginal insertion. There are three reasons for this recommendation. First, some women may be less physiologically responsive than others. The vibrator is helpful for these women in the same manner as are the vibrators commonly used by physical therapists in the treatment of people with cerebral palsy. In treating cerebral palsy, the vibration has a specific effect on the sensory and motor enervation of the muscle. A vibrator is used in sex therapy to cause vibration to go through the pubic bone to the sensory endings called muscle spindles within the pelvic musculature. This helps lower the physiological threshold for initiating the spinal reflex.

According to Dr. Mould, the second reason for using a vibrator in dildo form is to lower a patient's inhibitions and produce intense stimulation that is difficult to duplicate manually. This is especially helpful to women who have built up a history of non-orgasmic sexual experiences, which causes what is called orgasmic inhibition.

The final reason for use of a vibrator in dildo form, or a dildo alone, is for women who have relaxed pelvic muscles which cause the orgasmic response to be less intense than usual. These women are prescribed Kegel's exercise, with a dildo or dildo-type vibrator inserted to provide resistance. This exercise is essential for women suffering urinary stress incontinence. Dr. Mould stated that many women suffer varying degrees of incontinence at some point in their lives. The condition is often caused by the stretching of the pelvic ligaments during childbirth, which causes the bladder to prolapse. Kegel's exercise, in which the circumvaginal muscles are contracted and strengthened, is universally acknowledged as

the most effective way of avoiding urinary stress incontinence, short of surgery.

Dr. Mould cited a study which estimated that 20% of all sexually active women have used a vibrator at some point during their lives and stated that he knew of no medical harm which could be caused by the use of a vibrator on the female genital organs. Dr. Mould testified that he often directs his patients to adult bookstores to find dildo vibrators suitable for their therapy treatment and that he has ordered or purchased such devices for his patients. He testified that the vibrator kit which defendant was arrested for selling was substantially identical to other vibrator kits he had recommended for use by his patients. It was his opinion that, if such kits were to become not readily available to the general public, anorgasmic women would be "substantially impacted." He stated that unavailability "would put a very serious block in the way of effective treatment." He testified that effective vibrator kits functionally similar to the one sold by defendant could be obtained in adult bookstores, through mail-order establishments, and at some department stores.

Dr. Mould testified that he knew of no therapeutic purposes for an inflatable doll and believed such a device to be "more a novelty than any serious sex tool." The inflatable doll was not the basis of the trial court's determination of the issues of this case, and we will not discuss it further in this opinion.

The prosecutor contended that a dildo-type vibrator is obscene per se under the definition of the statute. The trial court inquired, "Is it your position that a device can be obscene even if the motivation for using the device is not obscene?" The prosecutor responded, "The legislature in their definition determined, at least in this case, that a device is obscene if it is designed and marketed or marketed primarily for the stimulation of the human genital organ." The court then asked, "My point is, is it still obscene even though the motivation for the stimulation is not obscene but therapeutic?" The prosecutor responded, "The definitions under our law would make that finding."

The trial court took the matter under advisement and later issued a carefully prepared and well-reasoned memorandum decision holding that the provisions of K.S.A. 21-4301(1), (2), and (3)(c) are unconstitutionally overbroad because they subject li-

censed physicians, psychologists, and sex therapists to possible criminal sanctions. The court made it clear that it did not render its decision on First Amendment grounds. As this case deals with *devices* rather than books or movies, it is different from the great majority of the published obscenity cases, which are typically argued and decided under the First Amendment's guarantee of freedom of speech. The court decided the case, instead, on the grounds that the statute infringes on the right to perform or receive recognized, legitimate medical treatment because it invades the right of privacy, and because it declares all devices encompassed by the statute obscene without requiring a determination of obscenity by constitutional standards.

The court severed the provisions of K.S.A. 21-4301 as they pertained to obscene devices, finding such could be done without affecting the enforcement of the other provisions of the statute. See *Kansas Retail Trade Co-op v. Stephan*, 522 F. Supp. 632, 643 (D. Kan. 1981), *aff'd in part, rev'd in part* 695 F.2d 1343 (10th Cir. 1982). This procedure was proper under the severance clause of K.S.A. 21-4301b.

Two issues are raised on appeal by the State: whether the defendant had standing to challenge the constitutionality of the statute, and whether the trial court erred in finding the statute overbroad. It will be helpful to our discussion to begin with the provisions and history of the challenged statute, which provides as follows:

"**21-4301. Promoting obscenity.** *(1) Promoting obscenity is knowingly or recklessly:*

"*(a) Manufacturing, issuing, selling, giving, providing, lending, mailing, delivering, transmitting, publishing, distributing, circulating, disseminating, presenting, exhibiting or advertising any obscene material or obscene device; or*

"*(b) possessing any obscene material or obscene device with intent to issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit or advertise such material or device; or*

"*(c) offering or agreeing to manufacture, issue, sell, give, provide, lend, mail, deliver, transmit, publish, distribute, circulate, disseminate, present, exhibit or advertise any obscene material or obscene device; or*

"*(d) producing, presenting or directing an obscene performance or participating in a portion thereof which is obscene or which contributes to its obscenity.*

"(2) *Evidence that materials or devices were promoted to emphasize their prurient appeal or sexually provocative aspect shall be relevant in determining the question of the obscenity of such materials or devices. There shall be a presumption that a person promoting obscene materials or obscene devices did so knowingly or recklessly if:*

"(a) *The materials or devices were promoted to emphasize their prurient appeal or sexually provocative aspect; or*

"(b) *the person is not a wholesaler and promotes the materials or devices in the course of the person's business.*

"(3)(a) Any material or performance is 'obscene' if:

"(i) The average person applying contemporary community standards would find that the material or performance, taken as a whole, appeals to the prurient interest;

"(ii) the average person applying contemporary community standards would find that the material or performance has patently offensive representations or descriptions of (A) ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse or sodomy, or (B) masturbation, excretory functions, sadomasochistic abuse or lewd exhibition of the genitals; and

"(iii) taken as a whole, a reasonable person would find that the material or performance lacks serious literary, educational, artistic, political or scientific value.

"(b) 'Material' means any tangible thing which is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound or other manner.

"(c) *'Obscene device' means a device, including a dildo or artifical vagina, designed or marketed as useful primarily for the stimulation of human genital organs.*

"(d) 'Performance' means any play, motion picture, dance or other exhibition perfomed before an audience.

"(e) 'Sexual intercourse' and 'sodomy' have the meanings provided by K.S.A. 21-3501 and amendments thereto.

"(f) 'Wholesaler' means a person who sells, distributes or offers for sale or distribution obscene materials or devices only for resale and not to the consumer and who does not manufacture, publish or produce such materials or devices.

"(4) It is a defense to a prosecution for obscenity that:

"(a) The persons to whom the allegedly obscene material was disseminated, or the audience to an allegedly obscene performance, consisted of persons or institutions having scientific, educational or governmental justification for possessing or viewing the same;

"(b) the defendant is an officer, director, trustee or employee of a public library and the allegedly obscene material was acquired by such library and was disseminated in accordance with regular library policies approved by its governing body; or

"(c) the allegedly obscene material or obscene device was purchased, leased or otherwise acquired by a public, private or parochial school, college or university, and that such material was either sold, leased, distributed or disseminated by a teacher, instructor, professor or other faculty member or administrator of such school as part of or incident to an approved course or program of instruction at such school.

"(5) The provisions of this section and the provisions of ordinances of any city prescribing a criminal penalty for exhibit of any obscene motion picture shown in a commercial showing to the general public shall not apply to a projectionist, or assistant projectionist, if such projectionist or assistant projectionist has no financial interest in the show or in its place of presentation other than regular employment as a projectionist or assistant projectionist and no personal knowledge of the contents of the motion picture. The provisions of this section shall not exempt any projectionist or assistant projectionist from criminal liability for any act unrelated to projection of motion pictures in commercial showings to the general public.

"(6) Promoting obscenity is a class A misdemeanor on conviction of a first offense and a class E felony on conviction of a second or subsequent offense. Conviction of a violation of a municipal ordinance prohibiting acts which constitute promoting obscenity shall be considered a conviction of promoting obscenity for the purpose of determining the number of prior convictions and the classification of the crime under this section.

"(7) Upon any conviction of promoting obscenity, the court may require, in addition to any fine or imprisonment imposed, that the defendant enter into a reasonable recognizance with good and sufficient surety, in such sum as the court may direct, but not to exceed $50,000, conditioned that, in the event the defendant is convicted of a subsequent offense of promoting obscenity within two years after such conviction, the defendant shall forfeit the recognizance." (Emphasis supplied.)

This statute was enacted as a part of the State's new criminal code in 1969. See L. 1969, ch. 180, § 21-4301. Prior to that date, the laws regulating obscenity in this state were contained in many different statutes. See Comment, *Kansas Criminal Code: Obscenity*, 19 Kan. L. Rev. 789, 789 (1971). In its first enactment, K.S.A. 21-4301 allowed dissemination of obscene materials to "persons or institutions having scientific, educational, governmental *or other similar justification* for possessing or viewing the same." L. 1969, ch. 180, § 21-4301(3). In *State v. Next Door Cinema Corp.*, 225 Kan. 112, 118, 587 P.2d 326 (1978), the defendant did not argue the obscenity of the movie, but claimed the term "other similar justification" was unconstitutionally vague. We agreed, but found the term to be mere surplusage which could be severed from the remainder of the act without affecting

its constitutionality. We therefore affirmed the defendant's conviction under the statute for commercially exhibiting an obscene movie.

Those portions of K.S.A. 21-4301 relating to obscene devices were not included within the statute until 1986. See L. 1986, ch. 121, § 3. We have not before determined the constitutionality of the present statute as it pertains to devices, but similar statutes have been examined by courts of other jurisdictions.

In a Texas case, *Yorko v. State,* 690 S.W.2d 260 (Tex. Crim. 1985), the defendant was found guilty of possession with intent to sell a dildo, a device specified as obscene in a statute quite similar to ours. The appellate court, with three judges dissenting in separate opinions, held that the statute did not violate a fundamental right of privacy and that the right to possess such a device in one's home did not imply a right of acquisition. The defendant did not raise the therapy or overbreadth arguments.

Two Georgia cases are in agreement with the Texas court. In the first, *Sewell v. State,* 238 Ga. 495, 233 S.E.2d 187 (1977), the defendant, an operator of an adult bookstore, was found guilty of selling an artificial vagina and an obscene magazine to an undercover officer. Several other unspecified sexual devices were also seized. The appellate court rejected without much discussion the defendant's arguments that the statute, also similar to ours, was overbroad or that it erred in defining the material and devices as obscene as a matter of law.

In the second Georgia case, *Simpson v. State,* 144 Ga. App. 657, 242 S.E.2d 265 (1978), the defendant operator of an adult bookstore was convicted of three counts of distributing obscene materials after selling two obscene magazines to an undercover officer. The court noted that a box of unspecified "sexually related paraphernalia" was seized. 144 Ga. at 658. The court, in a brief opinion, again rejected defense arguments that the obscenity statute was overbroad and that the seized items could not be declared obscene as a matter of law.

We have found only one other case with similar facts to ours. It is this case the trial court found persuasive. In *People v. Seven Thirty-five East Colfax, Inc.,* 697 P.2d 348 (Colo. 1985), the court consolidated three obscenity cases. The statute involved in these cases was very similar to ours. In the first case, *People v. Seven*

*Thirty-five East Colfax, Inc.*, the State instituted a civil action for injunctive relief against an adult bookstore, seeking to have certain items declared obscene under the statute. In the second case, *People v. Mizell*, ten defendants were charged with promotion and possession with intent to promote obscene materials and obscene devices. The trial court found the obscenity act to be unconstitutional and stayed the effect of its ruling pending the State's appeal. In the third case, *Adult Literary Guild v. Beacom*, the Adult Literary Guild sought an injunction against the enforcement of the obscenity act. The trial court permanently enjoined enforcement of the act, finding, *inter alia*, that the prohibition against the promotion of obscene devices violated the right to privacy.

The Colorado Supreme Court opinion is detailed and comprehensive; only that portion relating to obscene devices will be summarized. The court found the Adult Literary Guild had third-party standing because the consumers' privacy right in the use of the devices was inextricably bound with the vendors' supply of the devices. It further found standing because vendors are forced to choose between the economic injury suffered by conformance to the statute or possible criminal prosecution through disobedience. 697 P.2d at 368. The court analogized its standing analysis to that in *Carey v. Population Services International*, 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1977), in which the United States Supreme Court held a vendor of contraceptive devices had standing to assert the constitutional rights of its customers because of the danger that these third parties' rights would be diluted or adversely affected should the vendor's challenge fail. *Carey* noted that a vendor's standing "to assert the rights of potential purchasers of his product is even more compelling [where] . . . the rights involved fall within the sensitive area of personal privacy." 431 U.S. at 684 n.4. This is in part because, where personal privacy is involved, potential purchasers may hesitate to assert their own rights because of a desire to protect that privacy from the publicity caused by a legal action. 431 U.S. at 684 n.4, (citing *Singleton v. Wulff*, 428 U.S. 106, 117, 49 L. Ed. 2d 826, 96 S. Ct. 2868 [1976]).

The Colorado court in *Seven Thirty-Five* found overbroad that section of the obscenity act which provides that a person is guilty

of a misdemeanor if he " '[p]romotes or possesses with intent to promote any . . . obscene device,' " such device being defined as " 'a device including a dildo or artifical vagina, designed or marketed as useful primarily for the stimulation of human genital organs.' " 697 P.2d at 369. The court found the "blanket proscription" of all devices "designed or marketed as useful primarily for the stimulation of human genital organs" impermissibly burdened the right of privacy of those seeking legitimate medical or therapeutic use of such devices and impermissibly equated sex with obscenity. 697 P.2d at 370. It quoted *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65, 37 L. Ed. 2d 446, 93 S. Ct. 2628, *reh. denied* 414 U.S. 881 (1973), in its characterization of the right to privacy protecting " 'the personal intimacies of the home.' " 697 P.2d at 348. The court found the State had demonstrated no interest in the broad prohibition of the devices sufficiently compelling to justify this infringement on the right to privacy. It cited *United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 127 n.4, 37 L. Ed. 2d 500, 93 S. Ct. 2665 (1973), in support of its finding of "a sphere of constitutionally protected privacy which encompasses the intimate medical problems associated with sexual activity." 697 P.2d at 369 n.26.

The first issue to be decided here is whether the trial court erred in finding the defendant had standing to challenge the statute on the grounds that it impermissibly infringes upon the rights of persons other than himself. Although this is not a First Amendment case where a relaxed test for standing may be applied to protect freedom of association or speech, we nevertheless hold that the defendant has standing as a vendor of the devices.

We cite in support not only *Carey*, 431 U.S. 678, noted in our discussion of *Seven Thirty-Five*, 697 P.2d 348, but also *Craig v. Boren*, 429 U.S. 190, 50 L. Ed. 2d 397, 97 S. Ct. 451 (1976), *reh. denied* 429 U.S. 1124 (1977), in which the United States Supreme Court found that a tavern owner had standing to challenge a statute which permitted sale of beer to females 18 years of age and older, but not to males until they turned 21. The Court held that compliance with the law created an injury not only to the males but also to tavern owners. It stated that "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as ad-

vocates for the rights of third parties who seek access to their market or function." 429 U.S. at 195. Like the tavern owner in that case, defendant here is in the business of selling merchandise. Dr. Mould and persons with similar therapeutic purposes cannot lawfully purchase vibrator dildos under the statute, just as males under 21 years of age could not purchase beer from the tavern owner. We agree with the trial court's finding that enforcement of the statute by criminal proceedings would "materially impair the ability of women with legitimate sexual dysfunction or other similar problems to obtain devices prescribed by their doctors and therapists because the distribution of the devices is prohibited in all respects." Following the reasoning in *Boren, Carey,* and *Seven Thirty-Five,* we conclude that defendant has standing to challenge the statute on the grounds that it infringes not only his rights but the rights of third persons.

The remaining issue is whether the trial court erred in finding the statute overbroad. As Dr. Mould was the only witness at the hearing on the defendant's motion to dismiss, the only evidence in the record is that the dildo vibrator is effective and is commonly prescribed in the treatment of both anorgasmic and incontinent women.

Bearing this in mind, let us outline the perimeters of our review. A statute is overbroad when its language criminalizes constitutionally protected conduct. In matters relating to conduct rather than pure speech, the overbreadth must be substantial, judged in the light of the legitimacy of the statute in its entirety. *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 37 L. Ed. 2d 830, 93 S. Ct. 2908 (1973). The overbreadth doctrine generally has been held to apply only in First Amendment contexts. See *Schall v. Martin,* 467 U.S. 253, 268 n.18, 81 L. Ed. 2d 207, 104 S. Ct. 2403 (1984). In *Hearn v. City of Overland Park,* 244 Kan. 638, 645, 772 P.2d 758, *cert. denied* ___U.S. ___, 107 L. Ed. 2d 503 (1989), we held a city ordinance regulating ownership of pit bull dogs could not be attacked as overbroad because the owners' rights did not fall under the First Amendment.

Nevertheless, the overbreadth doctrine has been applied by the United States Supreme Court where the operation of a statute infringes on freedoms guaranteed by the Bill of Rights, where those freedoms involve privacy rights and medical matters. In

*Eisenstadt v. Baird,* 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972), a lecturer was convicted of giving a woman a package of contraceptive foam in violation of a Massachusetts statute prohibiting distribution of contraceptives to unmarried persons. The United States Supreme Court granted the defendant standing to assert the privacy and equal protection rights of unmarried persons. It held the statute *overbroad* as a health measure in its language prohibiting all contraceptives, regardless of their safety, to all unmarried persons. The Court found the statute violated the equal protection clause of the Fourteenth Amendment and affirmed the order of the United States Court of Appeals for the First Circuit discharging the defendant.

The trial court's decision was made on privacy and medical treatment grounds. The United States Supreme Court has found that a constitutionally protected zone of privacy exists under the First, Third, Fourth, Fifth, and Ninth Amendments to the United States Constitution. *Griswold v. Connecticut,* 381 U.S. 479, 484-86, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965). The Court has stressed that individuals have a fundamental "right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Stanley v. Georgia,* 394 U.S. 557, 564, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969). This liberty interest in privacy was held protected by the Fourteenth Amendment's restriction on state action against personal liberty in *Roe v. Wade,* 410 U.S. 113, 152-53, 35 L. Ed. 2d 147, 93 S. Ct. 705, *reh denied* 410 U.S. 959 (1973). We agree with the opinion in *Seven Thirty-Five* that a statute is impermissibly overbroad when it impinges without justification on the sphere of constitutionally protected privacy which encompasses therapy for medical and psychological disorders.

We thus find the trial court's analysis of the statute persuasive, except for one argument, which we will discuss.

The trial court found K.S.A. 21-4301 overbroad because it does not restrict its scope to distribution of devices for obscene purposes, noting the legislature cannot make a device automatically obscene merely through the use of labels. See *N.A.A.C.P. v. Button,* 371 U.S. 415, 429, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963). The trial court in the instant case found the statute must incorporate a requirement that the device is obscene under the stand-

ards set forth in *Miller v. California*, 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607, *reh. denied* 414 U.S. 881 (1973). Here, we disagree. The *Miller* standards are:

"(a) [W]hether 'the average person, applying contemporary community standards,' would find the work, taken as a whole, appeals to the prurient interest, [citations omitted];

"(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and

"(c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24.

These standards were set forth under the general assumption, which still prevails, that the obscene item will be a book, movie, or play, rather than a device. This standard is implemented in K.S.A. 21-4301(3)(a) in regard to material or performances, but not as to devices, to which the *Miller* standards do not apply. Instead, the legislature attempted to avoid a per se definition of obscene devices through its language in K.S.A. 21-4301(2), which states that "[e]vidence that materials *or devices* were promoted to emphasize their prurient appeal or sexually provocative aspect shall be relevant in *determining the question* of the obscenity of such materials or devices." (Emphasis supplied.) We agree with the trial court's finding that the term "sexually provocative aspect" impermissibly equates sexuality with obscenity. The legislature may not declare a device obscene merely because it relates to human sexual activity. *Roth v. United States*, 354 U.S. 476, 487-88, 1 L. Ed. 2d 1498, 77 S. Ct. 1304, *reh. denied* 355 U.S. 852 (1957).

We share the trial court's concern that a vendor could be held in violation of the statute regardless of the advertising, packaging, or proposed use of a dildo-type vibrator because K.S.A. 21-4301(3)(c) defines an obscene device as "a device, including a dildo . . . , designed or marketed as useful primarily for the stimulation of human genital organs." The Food and Drug Administration has promulgated regulations concerning "powered vaginal muscle stimulators" and "genital vibrators" for the treatment of sexual dysfunction or as an adjunct to Kegel's exercise. 21 C.F.R. §§ 884.5940 and 884.5960 (1989). Such regulations indicate that the federal government recognizes a legitimate need for the availability of such devices.

A therapist or a third person purchasing such a device for a woman at her request would nevertheless be subject to criminal prosecution because it is a violation of the statute to give, provide, or lend such a device, irrespective of its use, unless the "obscene device was purchased, leased or otherwise acquired by a public, private or parochial school, college or university, and . . . was either sold, leased, distributed or disseminated by a teacher, instructor, professor or other faculty member or administrator of such school as part of or incident to an approved course or program of instruction at such school." K.S.A. 21-4301(4)(c). Thus, under the statute, a doctor, psychologist, or sex therapist on the faculty of a school could lecture about these devices and distribute them to the class, but would not be allowed, under the statute, to exhibit or provide such a device to a patient for therapy.

The statute thus impermissibly infringes on the constitutional right to privacy in one's home and in one's doctor's or therapist's office. See *City of Junction City v. White*, 2 Kan. App. 2d 403, 404, 580 P.2d 891 (1978) (citing *Paris Adult Theatre I v. Slaton*, 413 U.S. at 66 n.13). We note the statute also restricts a doctor's freedom to exercise his or her medical judgment in providing medical services. See *State ex rel. Stephan v. Harder*, 230 Kan. 573, 588, 641 P.2d 366 (1982) (quoting *Minnesota Medical Ass'n v. State*, 274 N.W.2d 84 [Minn. 1978]). We further note that it is presumed under K.S.A. 21-4301(2)(b) that a person knowingly and recklessly promoted obscene devices merely because he or she promoted the devices in the course of a business. This impermissibly criminalizes a therapist who recommends the use of a sexual device to a patient.

When a state chooses to regulate matters involving sensitive rights of its citizens, it is obligated to do so in a manner that bears a real and substantial relationship to the objective sought (*Nebbia v. New York*, 291 U.S. 502, 525, 78 L. Ed. 940, 54 S. Ct. 505 [1934]) and is narrowly drawn to express only those objectives (*Carey v. Population Services International*, 431 U.S. at 686). We hold the dissemination and promotion of such devices for purposes of medical and psychological therapy to be a constitutionally protected activity. As the legislature made no provision for such acts, those sections dealing with obscene devices were properly found to be overbroad and unconstitutional. The

State has demonstrated no interest in the broad prohibition of distributing the devices in question sufficiently compelling to justify the infringement of the rights of those seeking to use them in legitimate ways.

The judgment is affirmed.