772 So.2d 64 (2000)
STATE of Louisiana
v.
Christine D. BRENAN.
No. 99-KA-2291.
Supreme Court of Louisiana.
May 16, 2000.
*65 Richard P. Ieyoub, Attorney General, Walter P. Reed, District Attorney, Dorothy Ann Pendergast, Metairie, Counsel for Applicant.
Doug Allen, Jr., Jefferson, Counsel for Respondent.
JOHNSON, J.[*]
The fundamental question presented in this case is whether Louisiana Revised Statute § 14:106.1, which bans the promotion of obscene devices, is constitutional. The defendant, Ms. Christine Brenan, was charged by bill of information with two counts of promotion of obscene devices in violation of La. R.S. § 14:106.1. She was convicted as charged and appealed, arguing that the statute was unconstitutional and violated the Fourteenth Amendment due process clause. The First Circuit Court of Appeal reversed the decision of the trial court finding that the obscene device statute lacked a rational relationship to a legitimate state interest and, therefore, violated the Fourteenth Amendment due process clause. After review of the record, legislative history, and applicable law, we affirm for the following reasons.

FACTS AND PROCEDURAL HISTORY
Ms. Christine Brenan was arrested on three occasions for selling obscene devices at her dance-wear boutique, The Dance Box. The first two arrests by Mandeville Police occurred in July and October of 1996 when the defendant's business was located in a Mandeville shopping center. Shortly thereafter, the defendant lost her lease and moved the business to another shopping center outside of the Mandeville *66 city limits. In September of 1997, Ms. Brenan was arrested again by St. Tammany Parish sheriffs deputies for selling obscene devices at her new location. The devices were located in an area of the boutique separated by latticework and labeled "For adults only." Most of the items seized were in the form of human genitals or packaged explicitly as a means to stimulate the male or female genitals. One device, however, the Mini Mite Massager, is neither shaped in the form of genitals nor packaged as a sexual device, but promoted as an instrumentality for stimulating scalp and muscle massage. Other devices are designed for stimulation of the anus. All of the devices, which were purchased by undercover police officers or seized pursuant to the defendant's arrest, were introduced into evidence at trial.
The defendant pled not guilty to the charges and filed a motion to quash the indictment on constitutional grounds. The trial court denied defendant's motion to quash and a six person jury found Ms. Brenan guilty as charged. The trial court sentenced her to two years in prison at hard labor for each count with sentences to run concurrently. The sentences were suspended and Ms. Brenan was placed on probation for five years, and fined $1,500 for each count. On appeal, defendant raised eight assignments of error. The court of appeals examined assignments of error numbers seven and eight. In assignment of error number 7, the defendant alleged that the statute was "unconstitutional on its face and as applied because it violates the defendant's property rights." In assignment of error number 8, the defendant further alleged that the statute "violates the privacy rights of the defendant and her customers under Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and its progeny, and privacy rights as guaranteed by Article 1, § 5, of the Louisiana Constitution, and other privacy rights retained by the people."
The First Circuit Court of Appeal reversed the defendant's convictions concluding that La. R.S. § 14:106.1 was unconstitutional. State v. Brenan, 98-2368 (La. App. 1st Cir.7/1/99), 739 So.2d 368. In finding the statute unconstitutional, the court of appeal adopted the rationale of a federal district court determining the constitutionality of Alabama's obscene device statute. See Williams v. Pryor, 41 F.Supp.2d 1257 (N.D.Al.1999). The federal court found that the Alabama obscene device statute supported no reasonable, rational relationship to a legitimate state interest and was therefore, in violation of the Fourteenth Amendment due process clause. Id. at 1295. The federal court declined to apply a heightened scrutiny analysis, finding that the right to privacy did not extend to protect the promotion of sexual devices. Id. The First Circuit Court of Appeal followed suit, recognizing that the state's legitimate interest in the protection of minors and unconsenting adults was within the scope of its police power. In testing the statute's reasonableness, the appellate court found that the statute swept too broadly when the same result could have been accomplished through less restrictive means. Brenan, 98-2368, pp. 6-7, 739 So.2d at 372. Having resolved the constitutional issue by finding the statute "overly broad" and violative of the Fourteenth Amendment due process clause, the court of appeal pretermitted the other six assignments of error.[1] We granted the State's writ application *67 and docketed the matter as an appeal pursuant to La. Const. art. 5, § 5 to determine whether La. R.S. § 14:106.1 is constitutional. State v. Brenan, 99-2291 (La.9/24/99), 750 So.2d 962.

ANALYSIS
La. R.S. § 14:106.1, which criminalizes the promotion or wholesale promotion of obscene devices, provides in pertinent part:
A. For the purposes of this Section, the following definitions shall apply unless the context clearly requires otherwise:
(1) "Obscene device" means a device, including an artificial penis or artificial vagina, which is designed or marketed as useful primarily for the stimulation of human genital organs.
(2) "Promote" means to manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, distribute, circulate, disseminate, present, or exhibit, including the offer or agreement to do any of these things, for the purpose of sale or resale.
B. No person shall knowingly and intentionally promote an obscene device.
It is well established that statutes are presumed to be valid, and the constitutionality of a statute should be upheld whenever possible. State v. Griffin, 495 So.2d 1306, 1308 (La.1986) (citations omitted). Because a state statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality. The attack will fail if the court determines that a reasonable relationship between the law and the promotion or protection of a public good, such as health, safety or welfare exists. Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515 (La.1983). Thus, we analyze La. R.S. § 14:106.1 within these guidelines.
La. R.S. § 14:106.1 is part of the larger statutory scheme set forth in La. R.S. § 14:106, which defines the crime of obscenity, describes its applicability, and provides for penalties therefrom. State v. Johnson, 343 So.2d 705 (La.1977). Although difficult to determine with particularity, obscenity is defined as those things that have a predominant appeal to one's prurient interests or those things in which a shameful or morbid interest in nudity, sex or excretion is expressed. Ward v. Illinois, 431 U.S. 767, 769, 97 S.Ct. 2085, 2087, 52 L.Ed.2d 738 (1977). Obscenity is not synonymous with sex. Sex is described as a "great and mysterious motive force in human life, [which] has indisputably been a subject of absorbing interest to mankind through the ages." Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Similarly, prurient interests should not be equated with normal, healthy interests in sex. Williams, 41 F.Supp.2d 1292 (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 498, 105 S.Ct. 2794, 2799, 86 L.Ed. 394(1985)). Sex is a natural function. As natural as breathing. It is a normal urge present in all human beings and other successful life forms, and it is essential to the propagation of the species.
The United States Supreme Court, while reviewing the constitutionality of New York's and California's obscenity *68 statutes, determined that obscenity is to be defined by community standards. Roth, 354 U.S. at 489, 77 S.Ct. at 1311. This Court has also concluded that a juror must be permitted "to draw on knowledge of the community or vicinage from which he comes in deciding what conclusion `the average person applying contemporary community standards' would reach in a given case." State v. Amato, 343 So.2d 698, 702 (La.1977) (citing Hamling v. United States, 418 U.S. 87, 105, 94 S.Ct. 2887, 2901, 41 L.Ed.2d 590(1974)). Under both federal and state laws, obscenity must be defined by "contemporary community standards" in order to withstand attacks of constitutional infirmity. Jenkins v. Georgia, 418 U.S. 153, 157, 94 S.Ct. 2750, 2753, 41 L.Ed.2d 642 (1974). Without a requirement for "community standards," due process is violated.
In Roth, obscenity was equated with prurience and those materials found to be obscene were not entitled to First Amendment protection. 354 U.S. at 498, 77 S.Ct. at 1327. Nine years later, the decision in Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), established a much more demanding three-part definition of obscenity, a definition that was in turn modified in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The basic difference between the Memoirs test and the Miller test was that Memoirs required that in order to be judged obscene, a work must be "utterly without redeeming social value," while Miller settled on the formulation, "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." Memoirs, 383 U.S. at 418, 86 S.Ct. at 977; Miller, 413 U.S. at 24, 93 S.Ct. at 2614. Today, the Miller guidelines are well established for identifying obscenity, and include:
(a) whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;
(b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.
Miller v. California, 413 U.S. at 24, 93 S.Ct. at 2615.
The Miller test is applicable to obscenity challenges of "works" under the First Amendment; however, the matter presently before the Court addresses devices in the context of obscenity not protected by the First Amendment. The United States Supreme Court has yet to evaluate devices in the context of obscenity. Thus, the matter before the Court is res nova. While acknowledging Miller's limitation to the First Amendment context, we are nonetheless guided by these principles in our determination of whether the devices at issue are indeed obscene or garner constitutional protection.
The State maintains that the court of appeal's finding of unconstitutionality was in error because there is no constitutional right impinged by La. R.S. § 14:106.1. The legislative act promotes a legitimate government interest, the protection of minors and unconsenting adults and the universal ban of obscene devices is a rational measure to effect this interest. On the other hand, the defendant argues that La. R.S. § 14:106.1 impermissibly burdens her right to privacy and those of her customers, the users of sexual devices.[2] If there is a fundamental right to *69 privacy implicated by the proscription of devices designed or marketed primarily for the stimulation of human genitals, as the defendant suggests, the legislative act must meet strict scrutiny requirements. Under this test, the state action "may be justified only by a compelling state interest, and the state action must be narrowly confined so as to further only that compelling interest." State v. Perry, 610 So.2d 746, 760 (La.1992). Thus, we must determine whether banning the sale of obscene devices implicates a constitutionally protected right.
Initially, we note that only seven other states have laws prohibiting the sale, distribution or promotion of obscene devices. See Ala.Code § 13A-12-200.2(a)(1); Colo.Rev.Stat. § 18-7-101, 102; Ga.Code Ann. § 16-12-80; Kan. Stat. Ann. § 21-4301; Miss.Code. Ann. § 97-29-105; Tex. Penal Code Ann. § 43.21, 43.23; Va.Code. Ann. § 18.2-373. The Supreme Courts of Kansas and Colorado struck down their obscene device statutes as overbroad and violative of privacy rights.[3]Seven Thirty-Five East Colfax, Inc., 697 P.2d 348 (Colo. 1985) (The statutory scheme ... impermissibly burdens the right of privacy....); State v. Hughes, 246 Kan. 607, 792 P.2d 1023 (1990) (We hold the dissemination and promotion of such devices for purposes of medical and psychological therapy to be constitutionally protected activity ... The State has demonstrated no interest in the broad prohibition of distributing the devices in question sufficiently compelling to justify the infringement of the rights of those seeking to use them in legitimate ways.) The Georgia and Texas statutes prohibiting the sale of obscene devices have withstood constitutional attacks on various grounds. See Sewell v. Georgia, 238 Ga. 495, 233 S.E.2d 187 (1977), appeal dismissed, 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978) (statute providing any device designed or marketed as useful primarily for the stimulation of human genital organs is obscene material not unconstitutionally vague or overbroad);[4]Regalado v. State, 872 S.W.2d 7, 11 (Tex.App.) (Brown, J., concurring), cert. denied, 513 U.S. 871, *70 115 S.Ct. 194, 130 L.Ed.2d 126 (1994) (constitutionally protected right to privacy does not include use of or possession with intent to promote obscene devices); Yorko v. State, 690 S.W.2d 260 (Tex.Crim.1985) (statute criminalizing promotion of and possession with intent to promote obscene devices upheld as legitimate exercise of state police power, justified under rationale of protecting the societal interest in order and morality). All of these cases and their respective obscene device statutes are distinguishable from this case and La. R.S. § 14:106.1. So, while we glean constitutional guidelines from these cases, they are not dispositive of the case before us.
The defendant argues that the ban on obscene devices impinges on her constitutional right to privacy and those of her clients. While the right to privacy does not specifically entail the use of sexual devices, defendant avers that such is an implied right. In the alternative, defendant asks this Court to extend privacy rights to encompass such uses. The United States Supreme Court has sought to identify those rights which qualify for heightened judicial protection, but are not specifically delineated in the Constitution's text. The established method of substantive due process analysis has two primary features. In Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), the United States Supreme Court stated that liberties that are fundamental are those that are "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [these rights] were sacrificed." A different description, embracing the same idea, of fundamental liberties appeared in Moore v. East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977), where the United States Supreme Court characterized fundamental rights as "liberties that are deeply rooted in this Nation's history and tradition." See, e.g. Griswold v. Connecticut, 381 U.S. 479, 494, 85 S.Ct. 1678, 1687, 14 L.Ed.2d 510 (1965); Griffin, 495 So.2d at 1309. In addition to finding a deeply rooted tradition, the United States Supreme Court has required a "careful description" of the asserted fundamental liberty interest in substantive due process cases. Washington v. Glucksberg, 521 U.S. 702, 722, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997).
In Glucksberg, the United States Supreme Court states that in addition to the specific freedoms protected by the Bill of Rights, the liberties specially protected by the Due Process Clause include:
[ (1) ] the rights to marry, Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967);
[ (2) ] to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942);
[ (3) ] to direct the education and upbringing of one's children, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925);
[ (4) ] to marital privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965);
[ (5) ] to use contraception, ibid; Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972);
[ (6) ] to bodily integrity, Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952);
[ (7) ] and to abortion, Casey[v. Planned Parenthood of Southeastern Pennsylvania], [505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674].
[ (8) ] We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment. Cruzan [v. Dir. Mo. Dept. Of Health], 497 U.S. [261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)].
Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258. (alteration in original).
This exhaustive list comprises only eight specific liberty interests or fundamental *71 rights. While recognizing liberty embodies more than what is specifically delineated by the Constitution in the Bill of Rights, the United States Supreme Court has always been reluctant to expand the concept of substantive due process because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Glucksberg, 521 U.S. at 720, 117 S.Ct. 2258 (quoting Collins v. City of Harker Heights, Texas, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)). By extending constitutional protection to an asserted right or liberty interest, the courts have, to a great extent, placed the "right" outside the arena of public debate and legislative action. Id. We must therefore "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the members of [the] Court." Id. (quoting Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)).
Article I, Section 5 of the Louisiana Constitution, entitled "Right to Privacy," states, in relevant part: "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." Soon after the enactment of the 1974 Constitution, this Court recognized the greater protections afforded by Art. I, § 5, and has continued to endorse this heightened right to privacy. See State v. Perry, 608 So.2d 594 (La.1992); Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1989). This Court has stated that "[o]ur state constitution's declaration of the right to privacy contains an affirmative establishment of a right of privacy ..." and that this "is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." State v. Hernandez, 410 So.2d 1381, 1385 (La.1982) (emphasis in original).
The Fifth Circuit of Louisiana found that the State's comprehensive ban on obscenity pursuant to La. R.S. § 14:106 did not unconstitutionally infringe on the right to privacy as applied to the seller of magazines for private viewing. State v. Honore, 564 So.2d 345, 349 (La.App. 5th Cir.1990). In Honore, the court of appeal found the defendant's reliance on the greater protection for individual rights afforded by the Louisiana Constitution was misplaced and instead held that Louisiana law was controlled by the United States Supreme Court's decision in U.S. v. 12 200 Ft. Reels of Super 8 MM Film, 413 U.S. 123, 126, 93 S.Ct. 2665, 2668, 37 L.Ed.2d 500 (1973), which observed:
[I]t is now well established that obscene material is not protected by the First Amendment. Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957), reaffirmed today in Miller v. California, 413 U.S. 15, at 23, 93 S.Ct. 2607, at 2614, 37 L.Ed.2d 419. As we have noted in United States v. Orito, 413 U.S. 139, at 141-143, 93 S.Ct. 2674, at 2677-2678, 37 L.Ed.2d 513{(1973)], also decided today, Stanley depended, not on any First Amendment right to purchase or possess obscene materials, but on the right to privacy in the home. Three concurring Justices indicated that the case could have been disposed of on Fourth Amendment grounds without reference to the nature of the materials. Stanley v. Georgia, supra, 394 U.S. [557], at 569, 89 S.Ct. [1243], at 1250[, 22 L.Ed.2d 542 (1969)] (Stewart, J., joined by Brennan and White, JJ., concurring).
In particular, claimant contends that, under Stanley, the right to possess obscene material in the privacy of the home creates a right to acquire it or import it from another country. This overlooks the explicitly narrow and precisely delineated privacy right on which Stanley rests. That holding reflects no more than what Mr. Justice Harlan characterized as the law's `solicitude to *72 protect the privacies of the life within [the home].' Poe v. Ullman, 367 U.S. 497, 551, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989 (1961) (dissenting opinion).
* * *
We are not disposed to extend the precise, carefully limited holding of Stanley to permit importation of admittedly obscene materials simply because it is imported for private use only. To allow such a claim would not be unlike compelling the Government to permit importation of prohibited or controlled drugs for private consumption as long as such drugs are not for public distribution or sale. We have already indicated that the protected right to possess obscene material in the privacy of one's home does not give rise to a correlative right to have someone sell or give it to others. United States v. Thirty-Seven Photographs, supra, 402 U.S. [363,] at 376, 91 S.Ct., 1400 at 1408, 28 L.Ed.2d 822 (1971) (opinion of White, J.), and United States v. Reidel, supra, 402 U.S. [351,] at 355, 91 S.Ct. [1410,] at 1412, 28 L.Ed.2d 813 (1971). Nor is there any correlative right to transport obscene material in interstate commerce. United States v. Orito, supra, 413 U.S. at 142-144, 93 S.Ct. at 2677-2678, 37 L.Ed.2d 513 (1973). It follows that Stanley does not permit one to go abroad and bring such material into the country for private purposes. `Stanley's emphasis was on the freedom of thought and mind in the privacy of the home. But a port of entry is not a traveler's home.' United States v. Thirty-Seven Photographs, supra, 402 U.S. at 376, 91 S.Ct. at 1408 (opinion of White, J.)." (Footnotes Omitted. Emphasis added).
Thus, Honore supports the proposition that "although one may have the right to possess and view obscene material in the privacy of his own home, this right does not equate to a right to acquire the obscene material." 564 So.2d at 350. We believe that obscene devices should be treated in the same fashion. There is no evidentiary basis to allow the defendant's proposed extension of a constitutional protection to promote devices "designed or marketed as useful primarily for the stimulation of human genital organs."[5] Given the narrow reading of substantive due process jurisprudence and the sparse evidence presented both in brief and oral argument, we do not extend constitutional protection in the way of privacy to the promotion of sexual devices.
If legislation does not burden a constitutionally protected right, then the legislative act faces minimal scrutiny. This scrutiny is commonly referred to as a rational basis test. When reviewing legislation under a rational basis test, courts ensure only that a legitimate governmental interest supports the legislation, and, that the resulting law bears a rational relation to that interest. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313(1985). For such a relationship to exist, the nexus between the state interest and the law at issue must be reasonable, and thus not arbitrary, capricious, or irrational. Williams v. Pryor, 41 F.Supp.2d at 1285 (citations omitted).
In the instant case, both parties and the court of appeal have mistakenly assumed that the primary purpose behind La. R.S. § 14:106.1 is to protect minors and unconsenting adults from viewing obscene devices; however, the minutes from the 1985 Senate Committee considering the bill reveal that the backers of the statute were more concerned with *73 waging a general war on obscenity.[6] According to the minutes, Mr. Ronald F. Plaisance, representing a group called Morality in Media of Louisiana, explained that the bill defined artificial penises and vaginas as obscene devices and provided penalties for the sale and promotion of these devices. Morality in Media became interested in this legislation following a recommendation from the Obscenity Law Center in New York, which characterized the law as "a simple way of helping in the war on obscenity." Mr. Plaisance further stated that the passage of the bill would help the police department in the suppression of the sale of these devices. When questioned as to the availability of these devices through the mail, Mr. Plaisance indicated that sales involving interstate commerce would be a federal matter. The bill was subsequently reported without opposition. Minutes of Senate Committee on Judiciary Section C, June 4, 1985, n.p.
The minutes from the House Committee on Criminal Justice shed further light on the purpose of the instant statute. Mr. Plaisance made a second appearance, urging that the bill would assist in the prosecution of individuals guilty of selling obscene devices in the state. Detective Bruce of the New Orleans Police Department advised the committee that the items should be illegal because there were "problems in New Orleans with an influx of pornography, various artificial genital organs, and other similar devices." According to the officer, the proposed legislation would give additional leverage to stop offenders. Minutes of House Committee on Criminal Justice, June 25, 1985, p. 5. The bill subsequently became law on July 23, 1985.
Against this backdrop, it is clear that the legislative basis for the enactment of R.S. § 14:106.1 was the suppression of all obscene devices. The law was passed during the anti-pornography crusade of the mid-1980's. This crusade culminated in the publishing of the Attorney General's Commission on Pornography in 1986, which focused on the alleged link between pornography and violence. However, obscene devices were not the object of the Commission's study. In fact, the Commission declined to label vibrators as obscene, with one doctor on the panel noting that "the ordinary vibrator is no more obscene than the Washington Monument." Joseph Scott, Book Review, 78 J.Crim L. & Criminology 1145, 1154 (1988). Nevertheless, the Louisiana legislature saw fit to treat such devices as obscene and prohibit the sale to all citizens.
This unqualified ban is designed, in theory, to promote morals and public order.[7] The traditional description of state police power does embrace the regulation of morals as well as the health, safety, and general welfare of the citizenry. "And much legislation ... is grounded, at least in part, on a concern with the morality of the community." Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973). Accord Bowers v. Hardwick, 478 U.S. 186, 196, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986) ( "The law, however, is constantly based on notions of morality ..."); Roth, supra. Thus, La. R.S. § 14:106.1, which bans the promotion of obscene devices in order to promote morals and public order, indeed furthers a legitimate government interest. However, we must still determine whether this statutory prohibition bears a rational relationship to this interest.
*74 As we stated earlier, the basic guideline for determining whether material is obscene was outlined in Miller v. California. Miller, supra. This Court has previously adopted the three-prong Miller test when determining whether material was obscene. See generally State v. Johnson, 343 So.2d 705 (La.1977); State v. Russland Enterprises, 555 So.2d 1365 (La.1990). We recognize that this test is traditionally used in the context of the First Amendment, but we find these well established guidelines helpful in determining whether the devices at issue are indeed obscene. The devices, herein, include an assortment of vibrators, clitoral stimulators, vacuum pumps, and massagers. While some of these devices may appeal to one's prurient interests, some may not. The legislature cannot make a device automatically obscene merely through the use of labels. See N.A.A.C.P. v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1963); Accord Roth, 354 U.S. at 487-88, 77 S.Ct. 1304.
La. R.S. § 14:106.1 differs dramatically from La. R.S. § 14:106 in three key ways. First, the comprehensive ban contained in § 106 adopts the Miller standards in determining whether material is obscene.[8] La. R.S. § 14:106.1 has no evaluation mechanism of contemporary community standards or prurient interest. La. R.S. § 14:106.1 is simply a legislative ban based on perception and legislative label. Without an evaluation mechanism of the material, La. R.S. § 14:106.1 cannot withstand the charge of constitutional infirmity. Second, an adversary hearing must be conducted to determine whether material is obscene under La. R.S. § 14:106, but there is no adversarial process under La. R.S. § 14:106.1 to determine if a device is indeed obscene.[9] In fact, in the instant case, the defendant does not concede that *75 the devices sold in her boutique are obscene. Third, there is an exception contained in La. R.S. § 14:106 for certain entities, most notably medical personnel.[10] La. R.S. § 14:106.1 is a blanket ban of all devices designed or marketed as useful primarily for the stimulation of human genital organs regardless of the entity promoting them.
The State's unqualified ban on sexual devices ignores the fact that, in some cases, the use of vibrators is therapeutically appropriate. The Food and Drug Administration has promulgated regulations concerning "powered vaginal muscle stimulators" and "genital vibrators" for the treatment of sexual dysfunction or as an adjunct to Kegel's exercise (tightening of the muscles of the pelvic floor to increase muscle tone).[11]See 21 C.F.R. §§ 884.5940 and 884.5960 (1989). Such regulations indicate that the federal government recognizes a legitimate need for the availability of such devices.[12] Other states, in evaluating their obscene device statutes, also used scientific evidence widely recognized in the medical community. While no scientific or medical evidence was introduced at trial in this case, we take notice of the medical evidence introduced in the other cases and the information available through medical journals. Compare City of Erie v. Pap's A.M., 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (... "the city need not `conduct new studies or produce evidence independent of that already generated by other cities'...'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'") (quoting Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). The Alabama and Kansas cases contain an extensive review of the medical necessity for sexual devices, and the cases clearly show that it is common for trained experts in the field of human sexual behavior to use sexual aids in the treatment of their male and female patients' sexual problems.
From a historical perspective, the creation of the vibrator has its roots in the field of medicine. See Natalie Angier, In the History of Gynecology, a Surprising Chapter, N.Y. Times, Feb. 23, 1999, at D5 *76 (discussing historian Dr. Rachel Maines's work, The Technology of Orgasm: `Hysteria,' the Vibrator, and Women's Sexual Satisfaction (Johns Hopkins Press, 1999) (Maines's work traces the development of the vibrator in the 19th century as a matter of accepted historical fact.)). Vibrators were marketed to the medical community as an aid in treating pelvic hypermia, or congestion of the genitalia. At least two dozen models of vibrators were available to the medical profession. Notwithstanding their reputation as a naughty novelty item, vibrators remain an important tool in the treatment of anorgasmic women who may be particulary susceptible to pelvic inflammatory diseases, psychological problems, and difficulty in marital relationships. Margaret Ramage, Management of Sexual Problems, British Medical Journal, November 28, 1998, at 1509; Marilyn Elias, Late-life love Sexuality, Harvard Health Letter, November, 1992, at 1. Likewise, penis vacuum constriction devices or "pumps" as well as penile rings are frequently used in the treatment of men suffering from erectile dysfunction. Keith Hawton, Integration of Treatments for Male Erectile Dysfunction, The Lancet, Jan. 03, 1998, at 7-8. There are many medical and health journals which discuss sex therapy and the medical uses of sexual devices in the course of treatment of sexual dysfunction.
Given these therapeutic uses, we cannot say that the State's actions in banning all devices that are designed or marketed primarily for the stimulation of the human genitals without any review of their prurience or medical use is rationally related to the "war on obscenity." La. R.S. § 14:106.1 contains none of the procedural safeguards of La. R.S. § 14:106, which allowed it to withstand constitutional attack. The procedural elements evaluating community standards and prurience as well as an adversarial hearing are not merely conveniences for the defendant, but necessities in order to safeguard one's substantive due process. La. R.S. § 14:106.1 is an unreasonable measure taken by the legislature in order to promote morals.

CONCLUSION
We find that La. R.S. § 14:106.1, which bans the promotion of obscene devices, bears no rational relationship to a legitimate state interest and is, therefore, violative of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The ruling of the Court of Appeal is affirmed.
AFFIRMED.
TRAYLOR, J., dissents and assigns reasons.
KIMBALL and VICTORY, JJ., concur in result.
LEMMON, J., concurs and will assign reasons.
TRAYLOR, J. (dissenting).
A constitutional analysis starts with the presumption of a statute's validity. See State v. Brenner, 486 So.2d 101 (La.1986). The legislation must only bear a rational relationship to a legitimate state interest, such as health, safety or welfare, in order to satisfy the substantive guarantee of due process in the federal and state constitutions. Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 520 (La.1983); New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
The majority concludes that La. R.S. § 14:106.1 fails the rational basis test. I disagree because the burden on the state in review of socioeconomic legislation under rational basis scrutiny is minimal at best. The United States Supreme Court in Heller v. Doe, 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) summarized the appropriate judicial deference as follows:
[rational-basis review does not] authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect *77 lines." New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam).... courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "`is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge v. Williams, supra, [397 U.S. 471,]at 485,[90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)] quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations illogical, it may be, and unscientific." Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69-70, 33 S.Ct. 441, 57 L.Ed. 730 (1913).
Heller, 509 U.S. at 319-320, 113 S.Ct. 2637.
The statute's ban on the sale of obscene devices is rationally related to its legitimate interest in protecting unconsenting adults and minors. Proscription of all "obscene devices" ensures that those who do not wish to see the devices will not do so, and the fact that consenting adults will have a harder time procuring obscene devices does not render the statute unconstitutional under a substantive due process analysis. See Washington v. Glucksberg, 521 U.S. 702, 117 S.Ct. 2258 (1997) (finding that total ban, rather than regulation, was rationally related to state's legitimate interest in preserving life).
The majority reasons that the ban on obscene devices is arbitrary because of the device's potential therapeutic use. Thus, the reasoning goes that the devices are not obscene because they fail the third prong of the Miller test. However, the exhibits in the record have labels that warn "Sold as a Novelty Only. This Product is not Intended as a Medical Device." In addition, no evidence was offered to show that devices designed or marketed in an obscene matter are necessary to achieve a therapeutic result. In other words, a vibrating device could be recommended by a doctor for sexual dysfunction, and fall outside the statute because it was not designed or marketed in an obscene manner.
Finally, the majority's focus on the device's function, i.e., the stimulation of human genitals, completely avoids the issue of what is objectionable about the devices in the first place. It is the device's packaging or design that offends. Under the statute, for the device to be "designed or marketed as useful primarily for stimulation of human genital organs," the packaging, advertising, or labeling of the device must somehow communicate the device's use. This communication, through structural depiction (i.e., an artificial vagina or penis), visual display, or descriptive wording, is the element that offends unconsenting adults and minor children. Because this element of the device is the applicable determination for what is obscene, the Miller guidelines are in fact satisfied.
Because the majority correctly determined that no fundamental right was implicated in the sale of obscene devices, the rational basis test is easily met by the state's lawful purpose in by banning the commercial sale of obscene devices to protect unconsenting adults and minors. Accordingly, I respectfully dissent.
NOTES
[*] KNOLL, J., not on panel. Rule IV, Part 2, § 3.
[1] The defendant urged six assignments of error which were not addressed by the court of appeal. The assignments of error were:

(1) The trial court erred when it declined to find the statute unconstitutional on its face because said statute does not require the trier of fact to apply the rule of Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).
(2) The trial court erred when it refused to permit defense counsel to question prospective jurors about their views of contemporary community standards, prurient interests, patently offensive conduct, or redeeming literary, artistic, political, scientific, or social value, and the privacy interests attendant thereto.
(3) The trial court erred when it ruled that evidence required by Miller could not be presented to the jury for consideration because it was irrelevant.
(4) The trial court erred when it refused to give an instruction to the jury requiring them to follow the rule in Miller, and by refusing to let counsel argue the Miller standards in opening and closing arguments.
(5) The trial court erred when it declined to find the statute unconstitutional on its face and as applied because said statute is vague and overly broad.
(6) The trial court erred when it permitted the state to introduce evidence which was not in violation of the statute but which was highly prejudicial and irrelevant.
(739 So.2d at 369.)
[2] This case differs from the federal case of Williams v. Pryor, 41 F.Supp.2d 1257 (N.D.Al. 1999), which included vendor plaintiffs and user plaintiffs. However, it is clear that the defendant has standing to assert the rights of the ultimate users, her customers. As a vendor, Ms. Brenan "is entitled to assert those concomitant rights of third parties that would be diluted or adversely affected" by her failure in this suit. See Carey v. Population Services Int., 431 U.S. 678, 684, 97 S.Ct. 2010, 2015, 52 L.Ed.2d 675 (1977) (Retailer of contraceptive devices had standing to assert the constitutional rights of his customers). See also Craig v. Boren, 429 U.S. 190, 192-197, 97 S.Ct. 451, 454-456, 51 L.Ed.2d 397 (1976). The consumers rights are "inextricably bound" to the activity prohibited by the statute, the promotion of sexual devices. People v. Seven Thirty-Five East Colfax, Inc., 697 P.2d 348 (Colo.1985) (quoting Carey, supra).
[3] This Court has previously recognized that "[i]ndividuals are protected from incursions by the state into certain areas of their lives by the Fourteenth Amendment of the United States Constitution, and, [sic] a statute would be overbroad and thus, constitutionally defective, if it extends state criminal authority beyond the proper reach of government into one of these protected areas." Griffin, 495 So.2d at 1309. In order for the doctrine of overbreadth to apply, however, a constitutionally protected right must be claimed in the prosecution. Id. at 1310. Overbreadth invalidations of statutes are generally inappropriate when the allegedly impermissible applications of the challenged statute affect conduct rather than speech. State v. Greco, 583 So.2d 825, 828-29 (La.1991); Accord Broadrick v. Oklahoma, 413 U.S. 601, 614, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973) (Overbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct.) The United States Supreme Court has stated that outside the limited First Amendment context, a criminal statute may not be attacked as overbroad. Schall v. Martin, 467 U.S. 253, 268 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984) citing New York v. Ferber, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Even if the devices, herein, might in some circumstances be protected by the First Amendment, no claim is made that the devices are in any way expressive or that their possession is in any way related to defendant's right to speak. See generally Sewell v. Georgia, 435 U.S. 982, 984, n. 2, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978) (Brennan, J., dissenting) (citing Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).
[4] As noted by the appellate judges specially concurring in this case, the Georgia ban on obscene devices may face difficulty withstanding any new challenges in light of Powell v. State, 270 Ga. 327, 510 S.E.2d 18 (1998), in which the Georgia Supreme Court found that the state's sodomy statute violated the right of privacy as guaranteed by the Georgia Constitution's due process clause.
[5] The idea that the use of a device to stimulate human genitals is part of private sexual conduct not proscribed by law is a broad assertion made by the defense. This Court has not determined whether the government can regulate aspects of non-commercial sexual activity. The United States Supreme Court has clearly stated that it has not yet decided whether lawful, private, sexual conduct is sheltered from state interference by the Constitution. Carey, 431 U.S. at 689 n. 5, 97 S.Ct. at 2018 n. 5.
[6] While Minutes do not form part of the law, they preserve the debates on proposed legislation within the legislature and, in this case, serve to elucidate the understanding and intent of the legislators. See Cole-Miers Post V.F.W. of Deridder v. State, et al., 99-2215 (La.2/12/00), ___ So.2d ___.
[7] The obscene device statute appears in Title 14, Chapter 1, Part VI, entitled "Offenses Affecting the Public Generally." The statute is further compartmentalized in subpart C, as those "Offenses Affecting the General Peace and Order." The legislature clearly thought this regulation effected the State's peace and order as well as morality.
[8] La. R.S. § 14:106 A reads in pertinent part:

The crime of obscenity is the intentional:
(2)(a) Participation or engagement in, or management, production, presentation, performance, promotion, exhibition, advertisement, sponsorship or display of, hard core sexual conduct when the trier of fact determines that the average person applying contemporary community standards would find that the conduct, taken as a whole, appeals to the prurient interest; and the hard core sexual conduct, as specifically defined herein, is presented in a patently offensive way; and the conduct taken as a whole lacks serious literary, artistic, political or scientific value. (b)Hard core sexual conduct is the public portrayal, for its own sake, and for ensuing commercial gain of:
(i) Ultimate sexual acts, normal or perverted, actual, simulated or animated, whether between human beings, animals or an animal and a human being; or
(ii) Masturbation, excretory functions or lewd exhibition, actual, simulated or animated, of the genitals, pubic hair, anus, vulva or female breast nipples; or
(iii) Sadomasochistic abuse, meaning actual, simulated or animated, flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals or female breast nipples, or the condition of being fettered, bound or otherwise physically restrained, on the part of one so clothed; or
(iv) Actual, simulated or animated, touching, caressing or fondling of, or other similar physical contact with, a pubic area, anus, female breast nipple, covered or exposed, whether alone or between humans, animals or a human and an animal, of the same or human sex, in an act of apparent sexual stimulation or gratification; or
(v) Actual, simulated or animated stimulation of a human genital organ by any device whether or not the device is designed, manufactured and marketed for such purpose. (emphasis added)
[9] La. R.S. § 14:106 F(1) reads:

Except for those motion pictures, printed materials, and photographic materials showing actual ultimate sexual acts or simulated or animated ultimate sexual acts when there is an explicit, closeup depiction of human genital organs so as to give the appearance of the consummation of ultimate sexual acts, no person, firm, or corporation shall be arrested, charged, or indicted for any violations of a provision of this Section until such time as the material involved has first been the subject of an adversary hearing under the provisions of this Section, wherein such person, firm, or corporation is made a defendant and, after such material is declared by the court to be obscene, such person, firm, or corporation continues to engage in the conduct prohibited by this Section. The sole issue at the hearing shall be whether the material is obscene.
[10] La. R.S. § 14:106 D reads:

(1) The provisions of this Section do not apply to recognized and established schools, churches, museums, medical clinics, hospitals, physicians ...
[11] The Food and Drug Administration has promulgated the following regulations concerning powered vaginal muscle stimulators and genital vibrators:

§ 884.5940 Powered vaginal muscle stimulator for therapeutic use.
(a) Identification. A powered vaginal muscle stimulator is an electronically powered device designed to stimulate directly the muscles of the vagina with pulsating electrical current. This device is intended and labeled for therapeutic use in increasing muscular tone and strength in the treatment of sexual dysfunction. This generic type of device does not include devices used to treat urinary incontinence.
(b) Classification. Class III (premarket approval).
§ 884.5960 Genital vibrator for therapeutic use.
(a) Identification. A genital vibrator for therapeutic use is an electrically operated device intended and labeled for therapeutic use in the treatment of sexual dysfunction or as an adjunct to Kegel's exercise (tightening of the muscles to the pelvic floor to increase muscle tone).
(b) Classification. Class II (performance standards).
21 C.F.R. §§ 884.5940 & 884.5960 (1984).
[12] The majority opinion of the court of appeals in instant case addresses this argument in a footnote, noting:

There is also the possibility that the instant statute might conceivably be applied to unsuspecting medical practitioners, sex therapists, etc., or might increase the difficulty of their patients in legally obtaining such devices in Louisiana. The Alabama and Kansas cases clearly contained evidence regarding the potential impact of the respective statutes upon medical practitioners, sex therapists, etc., and their patients; the Colorado case discussed such issues although it is not entirely clear if such evidence was introduced.
Brenan, 98-2368, at 7, n. 2, 739 So.2d at 373.